Opinion
 

 VOGEL (C. S.), P. J.—
 

 Factual and Procedural Background
 

 Respondents Keru Investments, Inc., and Viljo Kaila brought suit against Sam, Lev, Julia and Elena Moross, Sam, Victor and Ala Dorodny, Lada Company, Gardena Recycling Center, Inc., GL & Associates, George Lemer, F. Nooravi and appellant “Cube Constmction Company,”
 
 [1]
 
 for waste, intentional damage and destmction of property, negligent destruction of property, professional negligence, negligence, and conspiracy to commit waste. The only claims asserted against GL & Associates, George Lemer, Nooravi, and Cube Company were the two claims for professional negligence and negligence.
 

 
 *1415
 
 The principal facts leading to the lawsuit are undisputed. Respondent Kaila was the owner of a 35-unit apartment building located in Hollywood. He sold the property to the Morosses, the Dorodnys, and Lada Company (hereafter referred to as the Moross Group) in September of 1985, taking back a deed of trust.
 

 In 1988, while the Moross Group owned the building, they hired George Lemer of GL & Associates to engineer a seismic retrofit for the building. Thereafter, Cube Company was retained as the general contractor to perform the seismic retrofit construction work.
 

 On January 17, 1994, the Northridge earthquake struck, and the building sustained heavy damage. It was yellow-tagged by the city.
 

 The Moross Group conveyed the property to Keru Investments, a company wholly owned by Kaila, pursuant to an “Agreement for Acquisition of Real Property” dated October 7, 1994. As consideration, Keru Investments agreed to be subject to the first trust deed, thereby relieving the Moross Group of their obligations under the note, which at that time had an outstanding balance of $615,000.
 

 Prior to the conveyance, the Moross Group had attempted to file a quitclaim deed in favor of Kaila, and under paragraph 1.4 of the agreement, Kaila was to record a “Notice of Non-Acceptance.” The provision went on to state that “recordation of the Quitclaim Deed by Seller in favor of Kaila did not cause a merger of the [All-Inclusive Deed of Trust], and that the [All-Inclusive Deed of Trust] shall remain in full force and effect and a charge against the Real Property. Upon transfer of the Real Property from Seller to Buyer, Seller shall be released of any further liability or obligation under the [All-Inclusive Deed of Trust] pursuant to the Assumption Agreement and Release to be recorded concurrently therewith.”
 

 Paragraph 1.3 of the October 7, 1994, agreement provided: “Buyer acknowledges and agrees that the Real Property and the structures thereon have suffered severe earthquake and vandalism damage. Buyer acknowledges and agrees that Buyer is acquiring the Real Property subject to said damages and need for repairs, and is acquiring the Real Property in an ‘as is, where is’ condition. The Seller is not making any representations or warranties whatsoever in that regard. Buyer acknowledges that Buyer has made its own independent physical inspection of the Real Property.”
 

 Paragraph 1.6 of the agreement stated in part: “. . . Seller shall assign, transfer, and convey to Buyer all right, title, and interest of Seller in any
 
 *1416
 
 engineering plans and specifications, architectural plans, warranties, causes of action, or other claims arising out of, related to, or associated with the Real Property. Seller agrees to deliver to Buyer at closing any and all plans, specifications, warranties, or other documents Seller may have in Seller’s possession relating to the Real Property.”
 

 Respondents came to the conclusion that the plans and specifications drawn up by GL & Associates and George Lemer contained errors and omissions and that the constmction work performed by Cube Company and its owner Nooravi failed to follow the plans and specifications or was performed in an incomplete and unworkmanlike manner. They filed the above-described complaint. By the time of trial, Cube Company and Nooravi were the only remaining defendants. The following testimony was elicited from the witnesses.
 

 Harri Keto, the attorney who represented respondents in connection with the October 1994 agreement, testified that the transaction closed, that all documents the sellers had were transferred upon closing, and that there was no further writing contemplated to assign rights to respondents. After hearing the testimony, the court concluded that based on the terms of the agreement and the testimony of respondents’ attorney, “the evidence is insufficient as a matter of law to sustain a finding that there was in fact an assignment [of the claim against Cube Company] from the seller to the buyer.”
 

 Seb John Ficcadenti, a structural engineer, testified that he found differences between the plans engineered by Lemer and the actual bracing put in place in the building by Cube Company. In his opinion as an expert, he concluded that the amount of damage sustained by the building would have been greatly reduced if the retrofitting had been done in precise accordance with the plans. However, he conceded that if the building had not been retrofitted at all there would have been even more damage. The building was originally constructed prior to 1934, a time when little consideration was given to earthquake reinforcement.
 

 Richard Pastore, a certified public accountant, testified as to the loss of earnings suffered from the inability to rent out the building for the six months it took to repair the badly damaged building as compared to the one month which would have been necessary had the earthquake retrofit been done according to plans and the building only suffered “cosmetic” damage.
 
 [2]
 
 He concluded that earnings loss totaled at least $65,550.
 

 
 *1417
 
 Michael Waldron, a real estate appraiser, testified at trial that he evaluated the property in its condition before and after the earthquake. He concluded it was worth approximately $1 million prior to the earthquake and $320,000 afterward, which meant the earthquake damage caused a diminution in value of $680,000.
 

 Wilmot Frederick Macklin III, a professional cost estimator, estimated that it would cost $249,232 to repair the building’s structural earthquake damage and do the retrofitting necessary to stabilize it.
 

 For the defense, John Devine, the city building inspector, testified that the work done by Cube Company complied with all the requirements of the building department and that a permit had been issued.
 

 In closing, respondents’ counsel argued that total damages, including cost of repair and loss of earnings, was $337,432. Concerning negligence, the jury was instructed: “A contractor who constructs improvements pursuant to a construction contract assumes the duty to the owner to exercise care to build the improvements in a good and workmanlike manner. If the contractor fails to exercise due care in the construction of the improvements, the contractor is liable to the owner for the damages legally caused by his negligent performance. Plaintiff is considered to be the owner of the property.” Concerning damages, the jury was told: “If you find that defendant was negligent and that defendant’s negligence was a legal cause of plaintiff’s damage, plaintiff is entitled to reasonable compensation for damage to the property. If the damages have been repaired or are capable of repair so as to restore the fair market value as it existed immediately before the damage occurred, then the measure of damage is the cost of such repair, including reasonable compensation for the loss of use during the period of disrepair. If, however, the cost of repair is greater than the diminution in value to the property, that is the difference is [sz'c] the fair market value of the property immediately before and immediately after the damage, then the measure of damages is that diminution.”
 

 The jury found that Cube Company had been negligent and awarded respondents the sum of $242,000. After the verdict was rendered, the court held a hearing on alter ego and found insufficient evidence to establish that Nooravi was the alter ego of the Cube Company. Subsequently, the trial court denied appellant’s motions for judgment notwithstanding the verdict and for a new trial because they were “filed late” and were “meritless[.]” The court awarded attorney fees and costs to respondents in the amount of $47,049.72. Cube Company appealed the judgment and the order awarding attorney fees.
 

 
 *1418
 
 Discussion
 

 The primary issue raised by appellant Cube Company is whether a holder of a deed of trust (respondent Kaila) or subsequent owner of property (respondent Keru Investments) may bring a claim for negligent construction against a contractor hired by a prior owner, particularly where the subsequent purchaser is fully aware at the time of the conveyance of the significant damage sustained by the property as the result of the purported negligence. Cube Company further contends that if such a claim is cognizable under tort law, damages cannot include the loss of the benefit of the bargain or contractual attorney fees.
 
 [3]
 

 The issue of liability as it relates to a holder of a deed of trust was decided by the Supreme Court in
 
 Connor
 
 v.
 
 Great Western Sav. & Loan Assn.
 
 (1968) 69 Cal.2d 850 [73 Cal.Rptr. 369, 447 P.2d 609, 39 A.L.R.3d 224]. There, the court concluded that defendant Great Western, by virtue of its relationship with a developer, was “an active participant in a home construction enterprise” (69 Cal.2d at p. 864), owed “a duty of care ... to prevent the construction of defective homes”
 
 (ibid.),
 
 and was “clearly under a duty to the buyers of the homes to exercise reasonable care to protect them from damages caused by major structural defects”
 
 (id.
 
 at p. 866). The court found such a duty was owed to the purchasers of the homes by application of the test outlined in
 
 Biakanja
 
 v.
 
 Irving
 
 (1958) 49 Cal.2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358]: “ ‘The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are [1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant’s conduct and the injury suffered, [5] the moral blame attached to the defendant’s conduct, and [6] the policy of preventing future harm.’ ”
 
 (Connor
 
 v.
 
 Great Western Sav. & Loan Assn., supra,
 
 69 Cal.2d at p. 865.)
 
 [4]
 

 The court
 
 then
 
 turned to the question of whether the
 
 Biakanja
 
 criteria implied a duty on the part of Great Western in its role as “an active participant in a home construction enterprise” to holders of second deeds of
 
 *1419
 
 trust for the impairment of their security.
 
 (Connor
 
 v.
 
 Great Western Sav. & Loan Assn., supra,
 
 69 Cal.2d at p. 864.) The court concluded that “Great Western owed no independent duty of care to cross-complainants [the holders of the second deeds of trust],” based on the following analysis: “The balance of the factors set forth in the
 
 Biakanja
 
 case is significantly different when an investor in or pledgee of notes secured by second deeds of trust is substituted for a member of the home-buying public as the party claiming a duty of care on the part of the tract financier. Although some factors may indicate no difference between plaintiffs and cross-complainants insofar as Great Western’s duties are concerned, others point toward a duty to plaintiffs but not toward a duty to cross-complainants. [¶] The foreseeability of harm to cross-complainants as a result of defective construction was substantially less than in the case of plaintiffs. As security cross-complainants had notes from the home owners as well as second deeds of trust. Furthermore, they assured themselves of a substantial margin of safety against the risk that the notes would not be paid or that the homes would be worth less than the purchase price when they lent only 43 percent of the face value of the notes. . . . [¶] Likewise, Great Western’s negligence was more closely connected with plaintiffs’ injuries than cross-complainants’ injuries. Plaintiffs were injured by the diminution of value of their homes as a result of defective construction. Cross-complainants will be injured only if plaintiffs default on their notes and the diminution in value of the homes leaves insufficient security to protect the second trust deeds. [¶] Finally, substantially less moral blame attached to Great Western’s conduct with respect to cross-complainants than attached to its conduct with respect to plaintiffs. The roles played by cross-complainants and plaintiffs in the transaction were crucially different. Like Great Western itself, cross-complainants were investors in a business enterprise and dealt with [the developer] as creditors, not as purchasers of the homes it built. As substantial creditors of [the developer], cross-complainants were voluntary co-participants with Great Western and [the developer] in the enterprise of building and selling homes to the general public. Cross-complainants did not have Great Western’s power to prevent defective construction through control of construction loan payments; but, unlike plaintiffs, who had no practical alternative to accepting [the developer’s] qualifications and responsibility on faith, cross-complainants as substantial investors were in a position to protect themselves. Under these circumstances, we do not believe that either Great Western or cross-complainants were under a duty to exercise reasonable care to protect the other from negligence on the part of [the developer]. Accordingly, Great Western’s duty to exercise reasonable care to prevent [the developer] from constructing defective homes was limited to the members of the public who bought those homes.”
 
 (Connor
 
 v.
 
 Great Western Sav. & Loan Assn., supra,
 
 69 Cal.2d at pp. 870-871, fn. omitted.)
 

 
 *1420
 
 Respondents point to differences between its situation and the situation of the second trust deed holders in Connor, such as the fact that Kaila’s deed of trust was secured by a lesser percentage of the building’s value and the fact that he was not a professional trust deed lender. We do not believe these differences are significant enough to create a duty which would not otherwise exist. The key factors in
 
 Connor
 
 were the lack of foreseeability of harm and moral blame, both of which are also lacking here. Harm could have resulted to Kaila only if an unusually strong earthquake occurred at a time when the balance owed on the loan was great enough to tempt the Moross Group to default. Although this is what happened, foreseeability is not judged by hindsight. We are not persuaded that it was foreseeable in 1990 when Cube Company entered into its contract with the Moross Group. Nor do we believe that appellant’s conduct subjected it to moral blame. Appellant’s retrofitting efforts complied with the requirements of the building code, and there was no danger of loss of life. Another factor deemed significant by the court in
 
 Connor
 
 was also present—Kaila voluntarily took the risk of lending to the Moross Group and had the ability to protect himself through other means such as requiring greater security or earthquake insurance or pursuing the borrowers individually. There is no reason on these facts to carve out an exception to the rule of nonliability of contractors toward holders of deeds of trust or other interests secured by property for negligent construction which causes impairment of security.
 

 This leads us to the question of whether Keru Investments, as subsequent purchaser and current owner of the building, was owed a duty of care. Respondents rely on
 
 Huang
 
 v.
 
 Gamer
 
 (1984) 157 Cal.App.3d 404 [203 Cal.Rptr. 800], to support their tort claim. The plaintiffs there had purchased an apartment building approximately 10 years after it was constructed, intending to convert it into condominiums. They discovered a number of defects in the construction, including violations of the building code. Plaintiffs brought suit against the original owner/developer, the original designer, and the engineer for the project, claiming that the building had been defectively designed and constructed. The trial court granted a motion for nonsuit as to the designer (Mattson) and engineer (Connelly). The appellate court reversed as to those defendants because “Plaintiffs presented evidence that the building design of Mattson and the structural engineering of Connelly did not satisfy the requirements of the Uniform Building Code. Under Evidence Code section 669 proof of a statutory violation entitles the plaintiff to an instruction on the presumption of negligence where the plaintiff is within the class of persons for whose protection the statute or ordinance was adopted. . . . [¶] . . . We think it reasonable to conclude that the Uniform Building Code was designed to prevent the types of defects and damages to construction which occurred in this case. We also believe that subsequent
 
 *1421
 
 purchasers as well as tenants were among those intended to be protected by the code.”
 
 (Huang
 
 v.
 
 Gamer, supra,
 
 157 Cal.App.3d at pp. 413-414, fn. omitted.)
 

 The appellate court undertook a separate analysis with regard to the liability of the owner/developer. The trial court had granted a partial motion for nonsuit as to plaintiffs’ negligence cause of action against these defendants which eliminated economic damages and allowed recovery for physical injury to property only.
 
 (Huang
 
 v.
 
 Garner, supra,
 
 157 Cal.App.3d at pp. 418-419.) The court concluded that the Supreme Court in
 
 J’Aire Corp.
 
 v.
 
 Gregory
 
 (1979) 24 Cal.3d 799 [157 Cal.Rptr. 407, 598 P.2d 60], “changed the traditional rule of nonrecovery of economic loss in negligence actions, provided that the plaintiff is able to prove that the risk of harm was reasonably foreseeable and was closely connected with the defendant’s conduct and that the damages were not wholly speculative, nor the injury part of the plaintiff’s ordinary business risk. [Citation.]”
 
 (Huang
 
 v.
 
 Garner, supra,
 
 at p. 420.)
 
 J’Aire
 
 “allowed recovery of economic loss to extend beyond the area of professional negligence in the rendition of services, by permitting plaintiffs to recover economic losses in actions for negligent interference with prospective economic advantage where a ‘special relationship’ exists between the parties as described in
 
 Biakanja
 
 v.
 
 Irving, supra,
 
 49 Cal.2d 647. [Citations.]”
 
 (Huang
 
 v.
 
 Garner, supra,
 
 at p. 422.) (3) The same criteria used to determine duty of care in
 
 Biakanja
 
 are the key to determining whether a special relationship exists: “ ‘(1) The extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant’s conduct and the injury suffered, (5) the moral blame attached to the defendant’s conduct, and (6) the policy of preventing future harm.’ ”
 
 (Huang
 
 v.
 
 Garner, supra,
 
 at p. 423, quoting
 
 J’Aire Corp.
 
 v.
 
 Gregory, supra,
 
 24 Cal.3d at p. 804.)
 

 The court in
 
 Huang
 
 concluded that the criteria had been met in the case before it because “. . . the developer’s duty of reasonable care is logically owed to those who subsequently purchase a housing structure allegedly designed and constructed in a defective manner. [Citation.] We believe that duty of reasonable care also extends to subsequent purchasers who do not live in the building, but utilize it for investment purposes.
 
 On the evidence before us, we think it reasonable to assume that as a developer of numerous housing projects, Gamer intended eventually to sell the apartments and must have foreseen that the property would be purchased by individuals or entities for investment purposes.
 
 It was certainly foreseeable that defects in construction of the types asserted by plaintiffs in this case would damage subsequent
 
 *1422
 
 purchasers of the property as well as subsequent residents.”
 
 (Huang
 
 v.
 
 Gamer, supra,
 
 157 Cal.App.3d at pp. 423-424, italics added.) Moreover, “[t]here was testimony presented that the defects in the building are dangerous, despite the fact that for approximately 17 years they have not caused personal injury to any tenant. [¶] Failure to comply with the Uniform Building Code by a developer-contractor involves potential risk of harm to later purchasers.”
 
 (Id.
 
 at p. 424.) The court stressed that plaintiffs were “not seeking from these defendants losses for inability to convert to condominiums,” rather, “the damages they sought [were] the cost to repair the defects in the structure in order to bring it into compliance with the Uniform Building Code or acceptable alternatives.”
 
 (Id.
 
 at pp. 424-425.)
 

 Huang
 
 was followed in
 
 Sumitomo Bank
 
 v.
 
 Taurus Developers, Inc.
 
 (1986) 185 Cal.App.3d 211 [229 Cal.Rptr. 719], where the court held that a purchaser at a trustee’s sale may state a negligence claim against a builder. (185 Cal.App.3d at p. 215.) The purchaser, Sumitomo Bank, had loaned a developer money to build a condominium project secured by a deed of trust. The developer defaulted, and Sumitomo exercised its power of sale to purchase the property at the trustee’s sale for a bid equal to the amount of the outstanding indebtedness. After purchase, Sumitomo discovered latent defects in the construction. Sumitomo sued on a number of theories, and the court agreed with the trial court that most were barred by the antideficiency statute and the full credit bid. However, the court concluded that Sumitomo could properly state a negligence action. The court concluded: “As a general rule, a builder must exercise reasonable care toward those who purchase a housing structure. [Citation.] Privity of contract between the builder and the purchaser is not an essential requirement; rather, various factors are balanced to determine if liability will attach.”
 
 (Id.
 
 at p. 223.) Paraphrasing
 
 Biakanja,
 
 the court explained: “Even though the builder-trustor is not the seller, privity is not required and the issue of liability can be resolved by balancing the various factors delineated in
 
 Biakanja,
 
 i.e., whether the builder intended to put the project on the market for sale to the public; whether it was foreseeable the defects would harm a purchaser in the event of the builder’s default; whether the purchaser suffered injury; whether the builder’s negligence was sufficiently connected to the injury; the moral blame attached to the builder’s acts; and the policy of preventing future harm. [Citations.]”
 
 (Id.
 
 at p. 224.) “Negligent construction principles rest on a policy determination that purchasers of homes should not be harmed by defective housing caused by the breach of a duty to construct properly [citation]; and that such harm is foreseeable when housing projects are built for eventual sale [citation].”
 
 (Id.
 
 at p. 225.)
 

 Although
 
 Huang
 
 and
 
 Sumitomo Bank
 
 stand for the proposition that under some circumstances subsequent purchasers can assert claims for negligence
 
 *1423
 
 that occurred prior to their ownership, they are not necessarily supportive of respondents’ position. In those cases, the defendants were builder/developers who had constructed projects for purposes of resale. In that sense, they were similar to manufacturers who place dangerously defective products into the stream of commerce—they were expected to foresee the potential for injury to “consumers” from the defective “product.” Appellant was not a developer, and had not retrofitted the building with the expectation that it would be transferred by the Moross Group to a third party.
 

 There is another, more fundamental problem with respondents’ claim. Appellant performed the seismic retrofit for the Moross Group, and the earthquake damage that resulted from the failure to properly perform the work was suffered while the Moross Group owned the property. Put another way, not only was the defective construction work done on behalf of a previous owner, the building itself sustained the damage for which respondents seek recovery prior to the transfer of ownership to Keru Investments. This leads to the question of whether Keru Investments suffered any injury for which tort recovery is warranted.
 

 Tort recovery is based on the principle that “[e]very person is bound, without contract, to abstain from injuring the person or property of another, or infringing upon any of his rights.” (Civ. Code, § 1708.) Respondents argue that because knowledge of the defective work arose after the transfer of the property, Keru Investments suffered injury and has a tort cause of action. This confuses two distinct concepts: when a cause of action accrues and when the statute of limitations begins to run.
 

 “A cause of action accrues at the moment the party who owns it is entitled to bring and prosecute an action thereon. [Citations.]”
 
 (Collins
 
 v.
 
 County of Los Angeles
 
 (1966) 241 Cal.App.2d 451, 454 [50 Cal.Rptr. 586]; see
 
 Dillon
 
 v.
 
 Board of Pension Commrs.
 
 (1941) 18 Cal.2d 427, 430 [116 P.2d 37, 136 A.L.R. 800] [“A cause of action accrues when a suit may be maintained thereon . . . .”].) That is said to occur when “. . . events have developed to a point where plaintiff is entitled to a legal remedy, not merely a symbolic judgment such as an award of nominal damages.”
 
 (Davies
 
 v.
 
 Krasna
 
 (1975) 14 Cal.3d 502, 513 [121 Cal.Rptr. 705, 535 P.2d 1161, 79 A.L.R.3d 807].)
 

 Under this definition of accrual, a tort cause of action arose against appellant either when the defective work was completed or when the building sustained damage as the result of the Northridge earthquake. Neither the wrongful act nor the damages occurred while Keru Investments was the owner.
 

 
 *1424
 
 Except as otherwise provided by statute, “[e]very action must be prosecuted in the name of the real party in interest. . . .” (Code Civ. Proc., § 367.) “[T]he purpose of the statute is readily discernible . . . . It is to save a defendant, against whom a judgment may be obtained, from further harassment or vexation at the hands of other claimants to the same demand.”
 
 (Giselman
 
 v.
 
 Starr
 
 (1895) 106 Cal. 651, 657 [40 P. 8]; accord,
 
 Vaughn
 
 v.
 
 Dame Construction Co.
 
 (1990) 223 Cal.App.3d 144, 149 [272 Cal.Rptr. 261].) It is evident that the cause of action for negligent construction against appellant was held by the Moross Group and not the party to whom it transferred the property after the cause of action accrued. This is clear from the holding in
 
 Vaughn
 
 v.
 
 Dame Construction Co.,
 
 where the issue was “whether a real party in interest somehow loses standing to sue for damages suffered as a result of defective construction by the subsequent sale of the defective premises.” (223 Cal.App.3d at p. 146.) Defendant contractor obtained dismissal on the ground that after the plaintiff had sold the property (a condominium), she no longer had standing to sue. “[W]hat defendant apparently fails to understand,” explained the court, “is that the real party in interest is the party who has title to the cause of action, i.e., the one who has the right to maintain the cause of action. . . . While ordinarily the owner of the real property is the party entitled to recover for injury to the property, the essential element of the cause of action is injury to one’s interests in the property—ownership of the property is not. . . . Since it was the plaintiff’s interest in the property which was injured by the defendant’s defective construction, she is the owner of the cause of action entitled to maintain the present action. [¶] . . . Defendant apparently assumes the injury to property is or should be considered analogous to covenants which run with the land. Again, however, defendant cites no authority for the rather novel theory. [¶] The
 
 cause of action
 
 for damages as a result of injury to property, which was fully vested in plaintiff at the time of the injury, is personal property—not real property. . . . The right to recover damages for injury to property, being personal property, may be assigned or transferred. . . . There is no authority, however, for the proposition that the transfer of the real property automatically transfers plaintiff’s personal cause of action.”
 
 (Id.
 
 at pp. 147-148, original italics, fn. omitted.) In response to defendant’s concern that the ruling would subject it to multiplicity of lawsuits from other claimants, the court simply said: “No one other than plaintiff can recover for the damages she sustained as owner of the property at the time the injury occurred. The fact that the property was sold after the damage occurred does not mean the new owners are now the parties entitled to recover for the damage suffered by plaintiff while she was the owner.”
 
 (Id.
 
 at p. 149.)
 

 The same is true here. The injury was sustained by the Moross Group which owned the property when the earthquake devastated the building. Respondents cannot claim to own the cause of action simply because
 
 *1425
 
 they discovered the reason for the damage after the building was transferred. Under respondents’ reasoning, every party who purchased a hulk of a building would automatically have a right to bring a lawsuit if they could find some previously unknown factor which contributed to the building’s destruction. That is simply not the law. Choses in action belong to the party who suffered the injury. In this case the injury was suffered by Keru Investments’ predecessor, the Moross Group. In the absence of assignment, Keru Investments does not have standing to pursue it.
 

 Disposition
 

 The judgment is reversed. Appellant is awarded costs on appeal.
 

 Epstein, J., and Hastings, J.,‘concurred.
 

 A petition for a rehearing was denied June 18, 1998, and respondents’ petition for review by the Supreme Court was denied August 12, 1998.
 

 [1]
 

 During trial, it was determined that the correct name of appellant was “Cube Company, Inc.” and not “Cube Construction Company.” The court permitted an amendment of the complaint to conform to that understanding.
 

 [2]
 

 In fact, no repairs were made. The damage estimate was based on the time to complete repairs had they been undertaken.
 

 [3]
 

 In reviewing the record, we noted that the agreement which conveyed the property from the Moross Group to Keru Investments contained an assignment clause referring to all “causes of action, or other claims arising out of, related to, or associated with the Real Property.” We therefore asked the parties for briefing on whether, contrary to the ruling of the trial court, the assignment was effective and transferred the chose in action to Keru Investments. After review of the supplemental briefing, we were persuaded that the interpretation of the contractual provisions raised questions of fact not cognizable on appeal.
 

 [4]
 

 This aspect of the decision in
 
 Connor
 
 has been limited by statute. (See Civ. Code, § 3434.)