[No. A086602. First Dist., Div. Two. June 23, 2000.]

GEORGE KRUSI, as Trustee, etc., et al., Plaintiffs and Appellants, v. S.J. AMOROSO CONSTRUCTION CO., INC., et al., Defendants and Respondents.

**COUNSEL**

Richard G. White, Inc., Marlis McAllister and Steven M. White for Plaintiffs and Appellants.

Imai, Tadlock & Keeney, Bruce Imai and Jeffrey C. Tung for Defendants and Respondents.

**OPINION**

**HAERLE, Acting P. J.—**

### I. INTRODUCTION

In 1995, two testamentary trusts (hereinafter appellants), purchased a two-story commercial building. The following year, they filed suit against respondents, the architects and contractors who designed and constructed the building in 1985-1987, alleging improper design and/or construction. The trial court granted respondents summary judgment on the basis that appellants, the fourth owners of the building, lacked standing to sue. We affirm.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

The building at issue in this case is located at 3351 El Camino Real in Atherton, San Mateo County. Construction on it started in September 1985 and a notice of completion was filed in March 1987. Respondents, defendants below, are the building's architects and general contractor and some of the latter's subcontractors.

The owner of the building when it was completed was a corporation named Atherton Square II Associates, Inc. That entity was, apparently, the successor in interest to a partnership known as Atherton Square Partnership, which was the entity that originally contracted with the architects for the design of the building.[1] In September 1990, another partnership, 3351 El Camino Associates, acquired the building. That group sold it to appellants in February 1995, and appellants thus became its fourth (counting the first partnership) owners.

During the course of the original construction, a dispute arose between the first owner of the property, Atherton Square Partnership, and the architect, one of the respondents here. The dispute, which went to arbitration, ultimately included a claim by the owner that the architect's work was defective. More specifically, the owner claimed that there were leaks in the garage headwall. Prior to the completion of the arbitration, one of the architect's officers inspected the building and found evidence of such leaks. In a deposition taken in the course of the arbitration, that officer testified he was uncertain as to whether there had been any specific efforts undertaken by the general contractor, S. J. Amoroso Construction Co., Inc. (Amoroso), to remedy the water infiltration problem. The arbitration was heard by an American Arbitration Association arbitrator who, on April 30, 1988, ruled in favor of the architect on the owner's defective work claims.

Prior to the sale to appellants in 1995, their seller became aware of several leaks, which occurred during the rainy season, from the building's decks into various tenant offices. At least one of these leaks was characterized by the building manager as "persistent." The same manager testified that another tenant reported "numerous [leaks] over a period of years." These leaks were "to the best of [seller's] knowledge . . . repaired prior to the sale" to appellants. Indeed, the seller reported to its limited partners that the sale price would probably have to be reduced, albeit by only a small amount (probably around $15,000), because of the costs to repair those leaks.

---

[1]The record is silent as to the date of the transfer of ownership of the property between Atherton Square Partnership and Atherton Square II Associates, Inc.

The seller to appellants also found a "failure of the gypcrete underlayment on the second floor (i.e. crumbling) apparently due to the weight of a movable surgical table," but averred that it, too, was repaired.

Appellants represented to the trial court that, aside from the leaks that they believed to be repaired, they were unaware of any problems in the design and construction of the building. However, after their purchase of the building, the same building manager alleged that "the frequency and magnitude of the reported leaks at the subject building . . . increased." Thus, appellants contended that since their acquisition of the building, it "has sustained damages such as new leaks in the decks and deteriorating interior underlayment on the second floor."

All of this led appellants to hire consultants. These consultants advised appellants, at least according to the latter, that the persistent leaks and "deteriorating underlayment" were the result of "building wide deficiencies in the original design and construction of the subject building." One of these consultants, a contractor, stated that the "nature and cause for the defects and resultant damages . . . were not and are not exposed, open or evident without an invasive inspection" and would not be apparent to a layperson. The same contractor stated that much of the building's structure and components had been damaged "as a result of water infiltration." He went on to note that the inadequate construction and installation of a "waterproofing membrane," was "the cause for leaks at the subterranean garage walls."

Another of the consultants, an engineer, stated that damage had been sustained to a variety of flooring materials in the building "as a result of deteriorating gypsum flooring on the second story of the subject building."

In April 1996, appellants sued respondents for damages to the building, alleging causes of action for negligence, breach of implied warranty, and declaratory relief. After extensive discovery, in August 1998 respondent Amoroso moved for summary judgment. After briefing and argument, the trial court granted its motion on the basis that (1) there was no evidence of property damage as a result of the alleged defects, and (2) as a subsequent purchaser, appellants lacked standing to sue for the defects. It also ruled against appellants on their breach of implied warranty cause of action.[2]

Appellants filed a motion for reconsideration arguing, inter alia, that (1) a case the trial court may have relied upon in connection with the first part of

---

[2]Appellants explicitly do not appeal from this latter ruling. And neither the trial court in its ruling nor appellants in their briefs mention the cause of action for declaratory relief. It is, therefore, clearly not implicated in this appeal.

its ruling had been accepted for review by our Supreme Court and (2) there were additional facts negating the applicability of the principal authority the court relied upon regarding the standing issue. Additionally, other respondents filed "piggyback" motions for summary judgment. After additional briefing requested by the court, on January 14, 1999, it denied the motion for reconsideration and granted the additional motions for summary judgment filed by the other respondents. Judgments in favor of the respondents were entered at various dates in February and March 1999.

Appellants filed a timely notice of appeal.

## III.   Discussion

The controlling issue on this appeal is clearly that labeled "standing" by the trial court.[3] However, and as we shall develop more below, it is probably more properly phrased as when a cause of action for design or construction defects accrues and who then owns it—or, as applied here, who *doesn't* own it. In considering this seldom-litigated issue, we must necessarily decide which is the most applicable precedent, our own decision in *Huang v. Garner* (1984) 157 Cal.App.3d 404 [203 Cal.Rptr. 800] (*Huang*) or the recent decision of Division Four of the Second District in *Keru Investments, Inc. v. Cube Co.* (1998) 63 Cal.App.4th 1412 [74 Cal.Rptr.2d 744] (*Keru*).

*Huang* was a suit by subsequent purchasers of a Menlo Park apartment building for damages caused by alleged faulty design and construction of the building. The building had been constructed in 1965 by the original owner, sold to others in 1970, resold again a few years later, and purchased by the plaintiffs (who thus became its fourth owners) in 1974. The record in that case did not indicate any interim defects or problems with the building. However, after their 1974 purchase, the plaintiffs hired an engineer "to conduct an engineering study to determine what actions would need to be taken prior to converting the apartments to condominiums. [He] discovered extensive structural damage in the garage area of the apartments. This led to the discovery of other purported structural and design defects in the property." (*Huang, supra,* 157 Cal.App.3d at p. 411.) The plaintiffs sued a whole host of defendants on a variety of theories. Many of those defendants settled,

---

[3]The trial court, in ruling on the motion for reconsideration, found this issue controlling.

It bears noting that *not* involved in this appeal, indeed not even mentioned by the parties in their briefs, is anything implicating (1) the applicable statute of limitations, (2) when or how the alleged defects were discovered so as to trigger any such statute, or (3) section 337.15 of the Code of Civil Procedure establishing a 10-year statute of limitations for latent construction defects.

but the case went to trial against the original owner and developer of the property, his wholly owned construction company (which had constructed the building), and the project's building designer and civil engineer. The trial court granted a motion for a nonsuit as to the building designer and civil engineer at the close of the plaintiffs' case. The jury returned a verdict against the original owner/developer and his construction company, but the trial court also granted a partial nonsuit as to them. More specifically, the trial court ruled that, on their negligence and negligence per se causes of action, the plaintiffs could recover for physical damage only, i.e., not for economic damage. And it allowed no recovery for breach of warranty, ruling that the lack of privity of contract precluded such. (*Id.* at pp. 409-411.)

On appeal, this court reversed all the nonsuits. As to the complete nonsuit against the building designer and engineer, we stressed the extensive evidence on the record that the work of those defendants was, in several respects, violative of the Uniform Building Code; that evidence, we said, "was sufficient to allow the case to go to the jury upon an instruction as to negligence per se." (*Huang, supra,* 157 Cal.App.3d at p. 412.) As to those two defendants, we did not discuss at length the fact that the plaintiffs were successor purchasers or that the relevant defendants' work had occurred over 10 years earlier and been for an owner several real estate transactions removed from the plaintiffs. On those issues, we said only: "We also believe that subsequent purchasers as well as tenants were among those intended to be protected by the code." (*Id.* at p. 414.)

We also reversed the partial nonsuit as to the original owner/developer and his construction company on the negligence cause of action,[4] holding that, as to that cause of action, the plaintiffs were entitled to economic damages, in addition to recovery for physical damage. (*Huang, supra,* 157 Cal.App.3d at pp. 419-425.) On that subject, we concentrated primarily on the issue of when and under what circumstances economic damages were recoverable in property damage actions under the decision of our Supreme Court in *J'Aire Corp. v. Gregory* (1979) 24 Cal.3d 799 [157 Cal.Rptr. 407, 598 P.2d 60] and on the basic rule regarding to whom a tort duty is owed set forth in *Biakanja v. Irving* (1958) 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358]. Our discussion of the issue of liability to subsequent purchasers of the property was limited. As to it, we observed: "In this case, the developer's duty of reasonable care is logically owed to those who subsequently purchase a housing structure allegedly designed and constructed in a defective manner. [Citation.] We believe that duty of reasonable care also extends to

---

[4]Although we affirmed the trial court in its nonsuit of the plaintiffs on their implied warranty cause of action. (*Huang, supra,* 157 Cal.App.3d at p. 419.)

subsequent purchasers who do not live in the building, but utilize it for investment purposes. On the evidence before us, we think it reasonable to assume that as a developer of numerous housing projects, Garner intended eventually to sell the apartments and must have foreseen that the property would be purchased by individuals or entities for investment purposes. It was certainly foreseeable that defects in construction of the types asserted by plaintiffs in this case would damage subsequent purchasers of the property as well as subsequent residents. There was testimony presented that the defects in the building are dangerous, despite the fact that for approximately 17 years they have not caused personal injury to any tenant. [¶] Failure to comply with the Uniform Building Code by a developer-contractor involves potential risk of harm to later purchasers." (*Huang, supra*, 157 Cal.App.3d at pp. 423-424.)[5] We said nothing in that decision on the subject of "standing" (the trial court's term in this case) nor did we allude to the subject of when a cause of action for negligent design or construction might have accrued under the facts of that case.

Our decision in *Huang* was followed two years later by a decision of a division of the Fourth District, *Sumitomo Bank v. Taurus Developers, Inc.* (1986) 185 Cal.App.3d 211 [229 Cal.Rptr. 719] (*Sumitomo Bank*). In that case, the Court of Appeal reversed a trial court order sustaining a demurrer without leave to amend as to a negligence cause of action alleged by a lending bank against its borrower, a condominium developer that subsequently defaulted on its payments. After the default, the bank exercised its power of sale, and bought the property for the amount of its outstanding loan. (*Id.* at pp. 215-216.) In reversing the trial court's order dismissing the negligence claim by the lender-purchaser, the court said: "As a general rule, a builder must exercise reasonable care toward those who purchase a housing structure. [Citation.] Privity of contract between the builder and the purchaser is not an essential requirement; rather, various factors are balanced to determine if liability will attach." (*Id.* at p. 223.) Again, though, as in *Huang*, there was no discussion of either (1) when and how a cause of action for negligent construction may have accrued, or (2) the rights of remote purchasers of such a structure. In fact, the plaintiff in that case was clearly the first owner of the condominium project—or at least its first owner after the defendant-developer.

The recent *Keru* case reached a quite different conclusion, albeit on unique facts. A man named Kaila was the owner of an apartment building in

---

[5]The only precedent we cited in support of our conclusion was *Cooper v. Jevne* (1976) 56 Cal.App.3d 860, 868-869 [128 Cal.Rptr. 724]. That case held that the *first purchasers* of condominiums near Mammoth Lake in Mono County could sue the architects on the project for professional negligence, even though the architects were employed by the project's developers.

Hollywood; sometime prior to 1988, he sold it to the Moross Group. During that year, those owners hired an engineer and contractor to, respectively, design and effectuate a "seismic retrofit for the building." (*Keru, supra,* 63 Cal.App.4th at p. 1415.) In January 1994, the Northridge earthquake hit the area, and the building was badly damaged and ultimately "yellow-tagged" by the city. The Moross Group then conveyed the building to Keru Investments (Keru), a company wholly owned by the original property owner, Kaila. Under their sales agreement, Keru assumed the loan obligations of the Moross Group, and the latter agreed that the property was being bought on an "as is" basis only, i.e., without any warranties. The agreement even specifically recited the building's " 'damages and need for repairs.' " (*Ibid.*) Sometime later, Keru concluded that both the seismic retrofit design and construction work were faulty, and sued both the engineer and contractor. The former settled, but the case went to trial against the contractor, Cube Co., and its principal; a jury returned a verdict against them for $242,000 in damages for negligent construction work on the seismic retrofit. (*Id.* at pp. 1415-1417.)

On appeal, Cube Co. raised the issue of "whether a . . . subsequent owner of property . . . may bring a claim for negligent construction against a contractor hired by a prior owner, particularly where the subsequent purchaser is fully aware at the time of the conveyance of the significant damage sustained by the property as the result of the purported negligence." (*Keru, supra,* 63 Cal.App.4th at p. 1418.) On that issue, the appellate court ruled in favor of the contractor and reversed the judgment against it. It first analyzed the *Huang* and *Sumitomo Bank* decisions, noting that, although they stood "for the proposition that under some circumstances subsequent purchasers can assert claims for negligence that occurred prior to their ownership, they are not necessarily supportive of respondents' position. In those cases, the defendants were builder/developers who had constructed projects for purposes of resale. In that sense, they were similar to manufacturers who place dangerously defective products into the stream of commerce—they were expected to foresee the potential for injury to 'consumers' from the defective 'product.' Appellant was not a developer, and had not retrofitted the building with the expectation that it would be transferred by the Moross Group to a third party." (*Keru,* at pp. 1422-1423.)

But, the *Keru* court continued, there was a more fundamental reason why the results of *Huang* and *Sumitomo Bank* were inapplicable to the facts before it. That was because a prior owner, the Moross Group, owned the property *both* when the defective work was done *and* when the damage was sustained. The court stated: "not only was the defective construction work

done on behalf of a previous owner, the building itself sustained the damage for which respondents seek recovery prior to the transfer of ownership to Keru Investments." (*Keru, supra,* 63 Cal.App.4th at p. 1423.)

This, the court continued, implicated the fundamental issue of when, and in favor of whom, the cause of action for negligent construction accrued: " 'A cause of action accrues at the moment the party who owns it is entitled to bring and prosecute an action thereon. [Citations.]' [Citations.] That is said to occur when '. . . events have developed to a point where plaintiff is entitled to a legal remedy, not merely a symbolic judgment such as an award of nominal damages.' [Citation.] [¶] Under this definition of accrual, a tort cause of action arose against appellant either when the defective work was completed or when the building sustained damage as the result of the Northridge earthquake. Neither the wrongful act nor the damages occurred while Keru Investments was the owner. [¶] Except as otherwise provided by statute, '[e]very action must be prosecuted in the name of the real party in interest . . . .' (Code Civ. Proc., § 367.) '[T]he purpose of the statute is readily discernible . . . . It is to save a defendant, against whom a judgment may be obtained, from further harassment or vexation at the hands of other claimants to the same demand.' [Citations.] It is evident that the cause of action for negligent construction against appellant was held by the Moross Group and not the party to whom it transferred the property after the cause of action accrued. . . . [¶] . . . The injury was sustained by the Moross Group[,] which owned the property when the earthquake devastated the building. Respondents cannot claim to own the cause of action simply because they discovered the reason for the damage after the building was transferred. Under respondents' reasoning, every party who purchased a hulk of a building would automatically have a right to bring a lawsuit if they could find some previously unknown factor which contributed to the building's destruction. That is simply not the law. Choses in action belong to the party who suffered the injury. In this case the injury was suffered by Keru Investments' predecessor, the Moross Group. In the absence of assignment, Keru Investments does not have standing to pursue it." (*Keru, supra,* 63 Cal.App.4th at pp. 1423-1425.)

By way of support for its conclusion, the *Keru* court cited *Vaughn v. Dame Construction Co.* (1990) 223 Cal.App.3d 144 [272 Cal.Rptr. 261] (*Vaughn*). In that case, a construction company defendant was contending that the plaintiff, a former owner of real property, could not prosecute an action for negligent construction because of her transfer of the property. The Court of Appeal was not buying that contention: "No one other than plaintiff can recover for the damages she sustained as owner of the property at the time

the injury occurred. The fact that the property was sold after the damage occurred does not mean the new owners are now the parties entitled to recover for the damage suffered by plaintiff while she was the owner. In order for the new owners to maintain an action, they would first have to establish damage to their interests in the property. If, as plaintiff's counsel represents, the new owners bought the property with full knowledge of the defective construction and presumably paid no more than the fair market value of the property in its defective condition, there is little likelihood that the new owners would or could assert the same claim as plaintiff. [¶] As the person who sustained the damage, the cause of action was vested in plaintiff and she is therefore the real party in interest entitled to maintain the present action. The subsequent sale of the real property did not automatically assign or transfer her cause of action." (*Id.* at p. 149, fn. omitted.)[6]

These interesting precedents present us with the following two questions: (1) Can the holdings in *Huang* and *Sumitomo Bank* be harmonized with those in *Keru* and *Vaughn* on either of the bases suggested by the *Keru* court? (2) If so, on which side of the equation does this case fall? Our answers are, respectively, "yes" and "on the *Keru* side."

To elaborate: it will be remembered that the *Keru* court distinguished *Huang* and *Sumitomo Bank* on two distinct bases. First of all, it said that the defendants in those cases were both builders/developers who clearly intended to resell the properties at issue, whereas the defendant in *Keru* was a mere seismic retrofit contractor who had no such intention. Its second point of distinction implicated the issue of when and to whom the cause of action for negligent construction accrued. We think the second point has merit, but we are less impressed with the first.

As to that first point, we suggest that, in this day and age, it is next to impossible to predict with any degree of certainty what sort of property is constructed principally for resale and what is not. Thus, in three of the four principal cases involved, *Huang, Sumitomo Bank,* and *Keru,* the properties constructed were multifamily projects (in two of them apartments, in one a condominium complex). In *Vaughn,* it was a single condominium. Here, it is an office building. We are highly dubious as to the ability of either a court or a jury to declare which of these types of improved real property is more or less likely to be intended for resale. We are equally dubious regarding the

---

[6]Compare also *CAMSI IV v. Hunter Technology Corp.* (1991) 230 Cal.App.3d 1525, 1535 [282 Cal.Rptr. 80] (approaching the matter as an issue of the running of the statute of limitations, and holding that once the harm to the property is done "no case has held that each new owner . . . becomes entitled to a new statute of limitations against the tortfeasor").

proposition, implicit if not explicit in *Keru*, that different rules of law should apply depending on that fact and also depending on the nature of the defendant, i.e., whether it is a builder/developer, a contractor, or an engineer or architect. We thus reject the first line of distinction proffered by the *Keru* court between the two lines of cases discussed above.

We do, however, wholeheartedly embrace its second, involving the issue of accrual of a cause of action, a principle also articulated in *Vaughn*. It is clear that a cause of action for damage to real property accrues when the defendant's act causes " '*immediate* and *permanent* injury' " to the property or, to put it another way, when there is "[a]ctual and appreciable harm" to the property. (*CAMSI IV v. Hunter Technology Corp.*, *supra*, 230 Cal.App.3d at p. 1534.) In the current flurry of asbestos-related cases, many have been litigated involving alleged injuries to real property. The leading case of that sort in this district makes clear that a cause of action for asbestos-related injury to real property accrues when "damage" or "physical injury to property" occurs. (*San Francisco Unified School Dist. v. W. R. Grace & Co.* (1995) 37 Cal.App.4th 1318, 1327, 1329 [44 Cal.Rptr.2d 305].) This rule is, of course, simply a corollary of the general rule regarding accrual of causes of action. (See 3 Witkin, Cal. Procedure (4th ed. 1996) Actions, §§ 467-468, pp. 590-592.) We are aware of no reason why it should not apply, as the *Keru* court applied it, to actions alleging negligence in the design, engineering, or construction of buildings.

Thus, if, as, and when an owner of a building suffers harm because of inadequate design of, or engineering or construction work performed on a building, a cause of action accrues to that owner. To be sure, it may choose to deliberately transfer that cause of action to another, but without some clear manifestation of such an intention, the cause of action is not transferred to a subsequent owner. (*Vaughn*, *supra*, 223 Cal.App.3d at p. 149.) Nothing in *Huang* or *Sumitomo Bank* suggests a contrary rule for the simple reason that nothing in those cases suggests that any damage to the relevant building was ever discovered during a prior ownership.[7]

It is, of course, clear that a tort duty runs from an architect, designer, or contractor to not only the original owner for whom real property improvement services are provided, but also to subsequent owners of the same property. We made this point in *Huang* and, as we noted there, it is a basic rule deriving from the seminal case of *Biakanja v. Irving*, *supra*, 49 Cal.2d 647. There, our unanimous Supreme Court, through Chief Justice Gibson,

---

[7]And, as noted earlier, in *Sumitomo Bank*, the only prior owner was the developer-defendant itself.

held that an action in negligence may be maintained against one not in privity with the plaintiff if, inter alia, the transaction was designed to affect the plaintiff, the injury to the plaintiff was foreseeable and his or her harm certain, and there was a close connection between the defendant's conduct and the harm which occurred. (*Id.* at p. 650.)

But, as applied to a case such as this, the *Biakanja* rule simply means that a duty may run from an architect, engineer, or contractor to a subsequent owner of real property. It does not mean that, in a case implicating *damage to such property*, once a cause of action in favor of a prior owner accrues, another cause of action against the same defendant or defendants can accrue to a subsequent property owner—unless, of course, the damage suffered by that subsequent owner is fundamentally different from the earlier type. Thus, if owner number one has an obviously leaky roof and suffers damage to its building on account thereof, a cause of action accrues to it against the defendant or defendants whose deficient design or construction work caused the defect. But, if that condition goes essentially unremedied over a period of years, owners two and three of the same building have no such right of action against those defendants, unless such was explicitly (and properly) transferred to them by owner number one. But owners two and three could well have a cause of action against those same defendants for, e.g., damage caused by an earthquake if it could be shown that inadequate seismic safeguards were designed and constructed into the building. Such is, patently, a new and different cause of action.

Which brings us to the ultimate question of whether, on the facts of this case, we are talking about the accrual of the same, or different, causes of action. In answering this question, it needs to be borne in mind that the issue of when (and thus, in this case, to whom) a cause of action accrues is a question of fact. (*Institoris v. City of Los Angeles* (1989) 210 Cal.App.3d 10, 17 [258 Cal.Rptr. 418]; *Cullinan v. McColgan* (1927) 87 Cal.App. 684, 692 [263 P. 353].) Thus, on summary judgment, the moving party may not prevail unless there is no triable issue of material fact. (Code Civ. Proc., § 437c, subd. (o)(2); *Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 464 [63 Cal.Rptr.2d 291, 936 P.2d 70].)

We think the trial court correctly, albeit implicitly, determined that there was no such triable issue here. In that court, appellants belatedly presented, in support of their motion for reconsideration, a declaration by the trustee of the appellants stating, in broadly conclusory terms, that prior to the investigation done by the consultants he hired he was "not aware of any defects in

the original design or construction of the subject building." But the evidence before the court when it ruled on the first motion for summary judgment, including evidence adduced by appellants, was overwhelmingly to the contrary.

For example, in opposition to the original Amoroso motion for summary judgment, appellants presented a declaration of the building's property manager both during the regimes of appellants and its seller, 3351 El Camino Associates. He conceded that "tenants have reported leaks to my attention" and then averred that, since the date of appellants' purchase of the building, "the frequency and magnitude of the reported leaks . . . have increased," thus clearly conceding that after appellants' succession to ownership there was a continuation, in increased form, of the same problems extant during the prior ownership. Similarly, appellants answered "undisputed" to numerous Amoroso statements of fact with respect to *reported* problems with the building prior to appellants' ownership, including particularly tenants' complaints of water leaks prior to the sale of the property to appellants.[8]

But the icing on this particular cake is the concession by appellants that one of the respondents, the building's architect, had *actually litigated* a claim for improper design of the garage headwall and alleged resulting leaks therein in the course of a 1986-1988 arbitration with the original owners of the property. Although appellants argued in the court below that they were not attacking the design of those walls, they explicitly sought to recover for "water infiltration at all garage walls," and one of the defendants with respect to all such damage claims was the same architectural firm.

We conclude, in short, that there was no triable issue of material fact as to whether the causes of action that accrued to prior owners of the building were the same as that alleged by appellants.

---

[8]Similarly instructive is a declaration of a general partner of the prior owner, adduced by respondent Amoroso, to the effect that, prior to the sale of the property to appellants, there were "complaints from the tenants regarding water infiltration from the decks" and "a failure of the gypcrete underlayment on the second floor (i.e. crumbling) apparently due to the weight of a movable surgical table." Although the same declarant later executed a "supplemental declaration" for appellants asserting that he had made full disclosure to them prior to the sale, quite clearly he did not succeed in getting this particular horse back into the barn. This is made manifest by a declaration from appellants' consulting engineer, filed simultaneously with the referenced supplemental declaration, asserting that appellants were confronted by "deteriorating gypsum flooring on the second story of the subject building."

## IV. Disposition

The judgment is affirmed.

Lambden, J., and Ruvolo, J., concurred.

On June 29, 2000, and July 18, 2000, the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied October 18, 2000.