[No. G034668. Fourth Dist., Div. Three. July 31, 2006.]

THE STANDARD FIRE INSURANCE COMPANY, Plaintiff and
Respondent, v.
THE SPECTRUM COMMUNITY ASSOCIATION, Defendant and
Appellant.
[And 68 other cases.*]

*The *Spectrum Community Association v. Bristol House Partnership, Ltd.* (No. 00CC07398);
67 separate actions brought by the individual condominium unit owners and occupants against
Bristol House Partnership, Ltd., et al.

1118

COUNSEL

Kabateck Brown Kellner, Brian S. Kabateck, Richard L. Kellner; Robertson & Vick, Alex Robertson IV and Kevin Davis for Defendant and Appellant.

Morison-Knox Holden & Prough, William C. Morison-Knox, Marc J. Derewetzky, Robert C. Christensen and Laurence S. Near for Plaintiff and Respondent.

OPINION

**MOORE, J.**—Statutory law permits a condominium homeowners association to bring a construction defect action with respect to damages to the condominium complex. (Civ. Code, § 1368.3; see also former Code Civ. Proc., § 383, repealed by Stats. 2004, ch. 754.) When an action is filed, can an insurer under an occurrence-based commercial general liability policy avoid providing a defense to the insured condominium complex developer by the simple device of claiming that the homeowners association could not have been damaged during the policy period because the homeowners association did not then exist? We think not. This would deprive the developer of the bargained-for insurance coverage and transform the occurrence-based policy into a claims made policy. Moreover, it would likely mean that there would rarely ever be insurance coverage available with respect to the condominium construction defect litigation permitted by statute. No dice.

In the case before us, an insurance company brought a declaratory relief action seeking a determination that it had no duty to defend developers that were sued in a massive construction defect lawsuit pertaining to a condominium complex. The trial court granted summary judgment in favor of the insurance company. The homeowners association for the condominium complex claims error. It asserts that at least some of the property damage occurred during the policy period and the fact that the homeowners association itself did not yet exist during the policy period, or own any of the damaged property during the policy period, did not mean that the property damage was not covered under the insurance policy. We agree.

We reject the insurance company's argument that there can be no coverage under the occurrence-based commercial general liability policy just because the homeowners association did not exist, or own any of the damaged property, during the policy period. The critical question is when the property damage occurred, not when the homeowners association came into existence. We reverse and remand.

## I

## FACTS

The owners and occupants of the Spectrum Condominiums (Project) filed 67 separate construction defect lawsuits against the developers of the Project. They sought damages for, inter alia, bodily injury caused by mold infiltration, diminution in the value of their condominium units, and loss of use of those units.

Their homeowners association, known as The Spectrum Community Association (Association), also filed suit. It named as defendants Bristol House Partnership, Ltd., the prior owner and the developer of the Project, Urban Ventures Corporation and Bluestar Realty Ventures, Inc., the general partners of Bristol House Partnership, Ltd., Mercantile Builders, Inc., alleged to be the general contractor for the Project, and a number of other parties.

The Association's third amended complaint pleaded causes of action for strict liability, negligence, breach of implied warranty, negligent misrepresentation, breach of fiduciary duty, fraud and deceit, breach of contract, abatement of nuisance, and unfair competition. The third amended complaint contained a very extensive list of alleged design and construction defects affecting the Project. The Association sought damages for, inter alia, "costs of microbial remediation, costs to repair damaged property and/or costs to replace destroyed property, as applicable; costs of temporary housing, relocation, moving and storage expenses, security costs, loss of use and investigation costs . . . ." The Association estimated that its damages exceeded $20 million.

The Standard Fire Insurance Company (Standard Fire) issued a commercial general liability insurance policy with respect to the Project for the period of August 6, 1991, to August 6, 1992. However, the policy was cancelled effective June 26, 1992.

Standard Fire filed a complaint for declaratory relief, in which it sought a judgment declaring that it had no duty to defend or indemnify in connection with the construction defect litigation.[1] Standard Fire represented in its complaint for declaratory relief that Bristol House Partnership, Ltd., Urban

---

[1] All of the lawsuits were consolidated.

Ventures Corporation, Bluestar Realty Ventures, Inc., Mercantile Builders, Inc., and certain others had tendered the defense of the construction defect litigation to it.[2] Standard Fire also represented that it had agreed to defend these entities and persons under a reservation of rights.[3]

Standard Fire followed up with a motion for summary judgment, which it filed in the declaratory relief action. In its motion for summary judgment, Standard Fire said that none of the plaintiffs in the underlying construction defect litigation had owned any interest in the Project during the policy period and that the Association had not even been formed before the termination of the policy period.[4] In other words, it argued that there could be no potential for coverage under the policy for any of the construction defects plaintiffs claim because none of those plaintiffs could have suffered any damage during the policy period. Therefore, Standard Fire argued that it could not have any duty to defend with respect to the underlying construction defect litigation.

The Association, and certain of the individual plaintiffs in the underlying construction defect litigation, filed a cross-motion for summary judgment in the declaratory relief action. They sought a judgment to the effect that, as a matter of law, the policy provided coverage for defense and indemnity with respect to the underlying construction defect litigation. In support of their motion, they cited extensive evidence to the effect that significant damage had occurred to the Project during the policy period. This included the declaration of a forensic architect to the effect that property damage due to defective construction began as early as 1990 and "it is . . . reasonably certain

---

[2] Standard Fire represented that a number of cross-complaints had been filed in the consolidated litigation and that, in addition to the above-named entities, Urban Pacific Development Corporation, McKellar Construction, Inc., and Michael V. Reyes had requested that Standard Fire provide a defense. Standard Fire further represented that the policy was issued to Urban Pacific Development Corporation, and that Bristol House Partnership, Ltd., Urban Ventures Corporation, Bluestar Realty Ventures, Inc., Mercantile Builders, Inc. and McKellar Construction, Inc. were added as named insureds by endorsement. The record reflects that Michael V. Reyes was a limited partner of Bristol House Partnership, Ltd. McKellar Construction, Inc., was a subcontractor for the Project.

[3] On appeal, Standard Fire represents that it agreed to defend not only the parties identified above, but also Urban Pacific Development Corporation, McKellar Construction, Inc., Lee Brown, James Heyward, Michael V. Reyes, and Kevin D. Wieck, under a reservation of rights. Standard Fire describes the persons and entities for which it is providing a defense, other than Bristol House Partnership, Ltd., as "related entities and individual officers." The record reflects that Kevin D. Wieck was a limited partner of Bristol House Partnerhip, Ltd.

[4] The articles of incorporation for the Association were executed by Michael V. Reyes as incorporator and filed with the Secretary of State on August 31, 1993.

that actual property damage in the form of water-damaged drywall, ceilings, stucco, floors, framing members and carpets, dryrot [*sic*], mold and mildew, and resultant deterioration of building materials also began occurring and continued to occur in 1991 and 1992, some of which property damage still exists today." (Italics and boldface omitted.)

The Association and its co-moving parties stated that it was undisputed that damage to the Project had occurred during the policy period and furthermore that the plaintiffs in the underlying construction defect litigation had asserted that certain of the insureds under the policy were legally responsible for the damage. The Association and its co-moving parties argued that since it was undisputed that the damage had occurred during the policy period, the policy afforded coverage with respect to the underlying construction defect litigation as a matter of law. They further contended that the fact that the plaintiffs in the underlying construction defect litigation had not owned any interests in the Project at the time the damage occurred was irrelevant.

The Association and certain other plaintiffs in the underlying construction defect litigation opposed Standard Fire's motion for summary judgment on essentially the same grounds as they had outlined in their cross-motion for summary judgment. Standard Fire opposed the cross-motion for summary judgment based on the same arguments as it had presented in its own motion for summary judgment. Standard Fire did concede, only for the purpose of the cross-motion for summary judgment, that the Project, as opposed to the plaintiffs in the underlying construction defect litigation, had suffered property damage during the policy period.

The court granted Standard Fire's motion for summary judgment and denied the cross-motion for summary judgment. Judgment was entered in favor of Standard Fire in the declaratory relief action. The Association filed a notice of appeal from the judgment.[5]

---

[5] Notices of appeal were also filed by James Heyward and McKellar Construction, Inc., on the one hand, and Urban Pacific Development Corporation, Bristol House Partnership, Ltd., Urban Ventures Corporation, Bluestar Realty Ventures, Inc., Mercantile Builders, Inc., and Michael V. Reyes, on the other. Those appeals were dismissed and are no longer at issue in this matter.

In their briefing, Standard Fire and the Association seem to agree, albeit without citation to the record, that certain bodily injury plaintiffs filed appeals and that those appeals were also dismissed. Whether or not this information is correct, we note that the only appeal at issue before this court is the appeal filed by the Association.

## II

## DISCUSSION

### A. *Standard of Review:*

The issue that was before the trial court and is now before this court is a pure question of law, i.e., the interpretation of the insuring agreement of the insurance policy in question. (*Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 389–390 [33 Cal.Rptr.3d 562, 118 P.3d 589].) " 'The insurer is entitled to summary adjudication that no potential for indemnity exists . . . if the evidence establishes as a matter of law that there is no coverage. [Citation.] We apply a de novo standard of review to [a] . . . summary judgment when, on undisputed facts, the [judgment] is based on the interpretation or application of the terms of an insurance policy.' [Citations.]" (*Id.* at p. 390.) Here, it is undisputed that the Association did not exist during the policy period and that none of the owners of the individual condominium units owned them during the policy period. Accordingly, we review de novo the question of whether, given these undisputed facts, there is any potential for coverage under the policy, and thus any duty for Standard Fire to provide a defense with respect to the underlying construction defect litigation. (*Lomes v. Hartford Financial Services Group, Inc.* (2001) 88 Cal.App.4th 127, 132 [105 Cal.Rptr.2d 471] [insurer has duty to defend only if there is potential for coverage].)

As we shall explain, Standard Fire, as the plaintiff in this declaratory relief action and the moving party, failed to meet its burden to show that there was no potential for coverage. (Code Civ. Proc., § 437c, subd. (p)(1); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849 [107 Cal.Rptr.2d 841, 24 P.3d 493].) Consequently, the trial court erred in granting Standard Fire's motion for summary judgment.

### B. *Introduction:*

The insuring agreement at issue provides in pertinent part: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. . . . [¶] . . . [¶] This insurance applies to 'bodily injury' and 'property damage' only if: [¶] (1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' . . . , and [¶] (2) The 'bodily injury' or 'property damage' occurs during the policy period." The policy defines "bodily injury" to mean

"bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." It defines "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The policy defines "property damage" as "a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; [¶] b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it."[6]

Standard Fire contends that the Association did not and could not have suffered property damage during the policy period, so as to trigger coverage under this policy language, because the Association not only did not own any interest in the Project during the policy period, it did not even exist during the policy period. It explains that any loss the Association may have suffered is a purely economic loss, for which there is no insurance coverage.

The Association counters that damage to the Project occurred during the policy period and this is all that is required to trigger coverage under the policy. It claims that the court's ruling to the contrary is inconsistent with established precedent, namely *Garriott Crop Dusting Co. v. Superior Court* (1990) 221 Cal.App.3d 783 [270 Cal.Rptr. 678] (*Garriott*) and *Century Indemnity Co. v. Hearrean* (2002) 98 Cal.App.4th 734 [120 Cal.Rptr.2d 66] (*Century Indemnity*). Standard Fire responds that *Garriott* and *Century Indemnity* were wrongly decided. It says those cases contradict the general rule of occurrence-based policy interpretation as stated in *Remmer v. Glens Falls Indem. Co.* (1956) 140 Cal.App.2d 84 [295 P.2d 19] (*Remmer*) and approved by the Supreme Court in *Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645 [42 Cal.Rptr.2d 324, 913 P.2d 878] (*Montrose II*). Standard Fire also cites a litany of additional cases in an effort to show that *Garriott* and *Century Indemnity* should not control the outcome of this case.

Furthermore, Standard Fire claims that there is no potential for coverage because the Association does not even have a cause of action against the developers. It relies on various cases having to do with whether a property owner has a cause of action for damages that occurred prior to his or her acquisition of the property. The Association challenges Standard Fire's

---

[6] The parties do not discuss the effect of coverage for products or completed operations or the effect of policy exclusions pertaining to the insureds' own property or work product. They choose instead to discuss the significance of the language of the insuring agreement in a vacuum.

assertion and cites other cases, i.e., *Orange Grove Terrace Owners Assn. v. Bryant Properties, Inc.* (1986) 176 Cal.App.3d 1217 [222 Cal.Rptr. 523] (*Orange Grove Terrace*) and *Windham at Carmel Mountain Ranch Assn. v. Superior Court* (2003) 109 Cal.App.4th 1162 [135 Cal.Rptr.2d 834] (*Windham*), to show that a condominium homeowners association has a cause of action for construction defects by statute.

As we shall show, we conclude that *Garriott, supra,* 221 Cal.App.3d 783, and *Century Indemnity, supra,* 98 Cal.App.4th 734, were properly decided and are dispositive of the insurance policy interpretation issues. We further conclude that *Orange Grove Terrace, supra,* 176 Cal.App.3d 1217, and *Windham, supra,* 109 Cal.App.4th 1162, resolve, in the affirmative, the question of whether the Association may have a cause of action against the developers.

C. *Interpretation of Occurrence-based Policies—the "General Rule":*

(1) Remmer

In *Remmer, supra,* 140 Cal.App.2d 84, the insureds graded and filled portions of their property in 1947. In 1952, significant amounts of rock and earth from the fill area slid onto neighboring property. (*Id.* at p. 85.) The contractor who had performed the grading and filling work paid $5,000 to the owners of the neighboring property for the physical damage to that property. (*Id.* at p. 87.) However, the neighboring property owners filed suit against the insureds with respect to the continuing nuisance caused by the fill. (*Id.* at pp. 86–87.) The court awarded the neighboring property owners $2,000 for the diminution in the value of their property caused by the continuing nuisance. (*Id.* at p. 87.) The insureds then filed an action against their insurer to recover the $2,000, plus interest, attorney fees and costs. (*Ibid.*)

The comprehensive personal liability policy in question was in effect from October 26, 1945, to January 15, 1948, so it was in effect when the insureds graded and filled their property. However, it was no longer in force when the slide occurred in 1952. (*Remmer, supra,* 140 Cal.App.2d at p. 85.) The policy only applied to " 'occurrences during the policy period' " and the policy defined an "occurrence" "as 'an accident, or a continuous or repeated exposure to conditions, which results in injury during the policy period . . . .' " (*Id.* at pp. 85–86.) The court in the coverage litigation held that the policy did not provide coverage with respect to the diminution in value caused by the continuing nuisance, because that damage was incurred

after the termination of the policy period. (*Id.* at pp. 89–90.) The court stated, inter alia: "The general rule is that the time of the occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed, but the time when the complaining party was actually damaged. [Citations.]" (*Id.* at p. 88.)

Standard Fire seizes upon the above quoted general rule to make its case. Standard Fire emphasizes the reference to the complaining party, urging that the controlling factor is not the date the damage occurs, but rather the date that the *complaining party* suffers damage. In other words, since the Association in the case before us did not exist during the policy period in question, the Association could not have suffered damage during the policy period irrespective of the fact that at least some of the damage occurred during the policy period. Standard Fire misreads the case.

■ Despite the wording of the general rule quoted above, the *Remmer* court actually based its decision not upon who suffered damage, but on the fact that the particular cause of action at issue was for damages clearly occurring only after the policy period had expired. It explained: "The complaint brought against [the insureds] by the [neighboring property owners] was for a presently (1952) existing damage which did not occur during the effective date of the policy. As already pointed out, it is not the happening of the wrongful act that is covered by the policy, but the damage flowing therefrom. To be covered by the policy the damage sued for must have occurred during the policy." (*Remmer, supra,* 140 Cal.App.2d at pp. 89–90.) The damage sued for, i.e., the continuing nuisance in 1952, did not occur during the policy period, so there was no coverage. (*Id.* at p. 90.)

In the case before us, the Association seeks compensation for damage that allegedly occurred at least in part during the policy period. Unlike the situation in *Remmer, supra,* 140 Cal.App.2d 84, it does not seek compensation for damages occurring only after the expiration of the policy period. Rather than barring a duty to defend, *Remmer* supports the conclusion that Standard Fire does indeed have a duty to defend, because the damage in question allegedly occurred at least in part during the policy period. As an aside, we note that *Remmer* did not involve an instance in which damage took place during the policy period and the damaged property changed hands afterwards. As to Standard Fire's argument that the change in ownership of the damaged property is key, *Remmer*, rather than being controlling, is inapposite.

(2) Montrose II

Standard Fire disagrees with this interpretation of *Remmer, supra,* 140 Cal.App.2d 84. It emphasizes the fact that the Supreme Court, in *Montrose II,*

*supra,* 10 Cal.4th 645, noted with apparent approval the *Remmer* general rule about the date the complaining party suffered harm. Standard Fire endeavors to convince us that the focus should be on the complaining party, not on the date the property damage occurred. However, as we shall show, Standard Fire overplays the significance of the *Montrose II* reference to *Remmer.*

*Montrose II* was a toxic waste case. Montrose Chemical Corporation of California (Montrose), the insured, manufactured pesticide at a certain plant from 1947 to 1982. *(Montrose II, supra,* 10 Cal.4th at pp. 654–655.) Various environmental lawsuits were brought against Montrose with respect to different contaminated sites. The suits pertained to chemical wastes generated by Montrose and deposited onto the sites between 1968 and 1972, with respect to the Stringfellow site, and prior to 1964 or 1965, with respect to the Parr-Richmond site. *(Id.* at pp. 656–659.) The United States, the State of California, and numerous other plaintiffs sued Montrose with respect to the Stringfellow site. *(Id.* at pp. 656–657.) Levin Metals Corp., who purchased the Parr-Richmond site from Parr-Richmond Terminal Co. (Parr-Richmond) in 1981, sued the latter. Parr-Richmond, in turn, cross-complained against Montrose for contribution and indemnity. *(Id.* at pp. 658–659.)

Seven different insurance carriers provided comprehensive general liability (CGL) insurance to Montrose between 1960 and 1986. The insurance carrier in question, Admiral Insurance Company (Admiral), issued four CGL policies to Montrose between 1982 and 1986. *(Montrose II, supra,* 10 Cal.4th at pp. 654–656.) Montrose brought a declaratory relief action with respect to insurance coverage. *(Id.* at p. 656.)

In that action, the court addressed, inter alia, whether Admiral had a duty to defend Montrose with respect to the toxic waste cases, despite the fact that the deposit of chemical waste on the sites in question occurred prior to the commencement of the policy periods. *(Montrose II, supra,* 10 Cal.4th at pp. 654–656.) As the court said, it set out to determine "when potential coverage is triggered under a CGL policy where the underlying third party claims involve continuous or progressively deteriorating damage or injury, and how the loss-in-progress rule applies to such policies." *(Id.* at p. 661, fn. omitted.) It concluded "that the standard CGL policy language, such as was incorporated into Admiral's policies in issue in this case, provides coverage for bodily injury and property damage that occurs during the policy period. In the case of successive policies, bodily injury and property damage that is continuous or progressively deteriorating throughout several policy periods is potentially covered by all policies in effect during those periods. Stated in the

insurance industry's parlance, we conclude the 'continuous injury' trigger of coverage should be adopted for third party liability insurance cases involving continuous or progressively deteriorating losses. In this case, because the potential of coverage arose under Admiral's policies, so too did its duty to defend Montrose in the underlying lawsuits." (*Id.* at pp. 654–655, fns. omitted.)

■ The Supreme Court in *Montrose II, supra,* 10 Cal.4th 645, rejected Admiral's argument that once an occurrence has given rise to some appreciable damage a policy issued thereafter cannot be on risk for progressive damage occurring during the policy period. (*Id.* at p. 669.) In doing so, the Supreme Court, citing *Remmer, supra,* 140 Cal.App.2d 84, stated that "California courts have long recognized that coverage in the context of a liability insurance policy is established at the time the complaining party was actually damaged." (*Montrose II, supra,* 10 Cal.4th at p. 669.) It further stated that "[t]he *Remmer* formulation, which distinguishes between a wrongful act and the injurious result of that act, and holds that the triggering of liability coverage under a CGL policy is established at the time the complaining third party was actually damaged, has been embraced by . . . noted experts . . . [citations]." (*Id.* at p. 670.) Put another way, the triggering of coverage with respect to a particular CGL policy is established when the damage about which the plaintiff complains takes place, even if some damage has already taken place during a prior policy period.

There is no reason why *Montrose II, supra,* 10 Cal.4th 645, should bar a duty to defend in the case before us. The insurer in *Montrose II* was held to have a duty to defend irrespective of the fact that the continuing damage began long before the policies in question were issued, and indeed, before plaintiff Levin Metals Corp. purchased the contaminated Parr-Richmond site. The case simply does not compel a conclusion that when damage initially occurs during the policy period of an occurrence-based CGL policy there can be no potential for coverage just because the plaintiff does not come knocking on the door until after the policy period has ended. To hold otherwise would be to transform the policy into a "claims made" policy. (*Id.* at pp. 688–689.)

■ Moreover, as the Supreme Court in *Montrose II* noted, " '[t]he right to coverage in the third party liability insurance context draws on traditional tort concepts of fault, proximate cause and duty. . . .' [Citation.]" (*Montrose II, supra,* 10 Cal.4th at p. 664.) "In the typical third party liability policy, the carrier assumes a contractual duty to pay judgments the insured becomes legally obligated to pay as damages because of bodily injury or property

damage caused by the insured. [Citation.]" (*Id.* at p. 663.) Under "the standardized CGL policy language . . . coverage is triggered by damage or injury occurring during the policy period." (*Id.* at p. 669, italics omitted.) Here, the Association alleges tort liability against the insured developers and property damage occurring at least in part during the policy period. Thus, Standard Fire has a duty to defend, under *Montrose II.*

D. *Interpretation of Occurrence-based Policies in Connection with Subsequent Purchasers:*

(1) Garriott *and* Century Indemnity

Standard Fire disagrees with the foregoing analysis, maintaining that there is no potential for coverage, because the Association did not own the property when the damage occurred. The cases of *Garriott, supra,* 221 Cal.App.3d 783, and *Century Indemnity, supra,* 98 Cal.App.4th 734, demonstrate the error in Standard Fire's reasoning. Standard Fire does not concede the point. Rather, it insists that these two cases are poorly reasoned, and inconsistent with the *Remmer, supra,* 140 Cal.App.2d 84, general rule as noted in *Montrose II, supra,* 10 Cal.4th 645. However, as we shall show, *Garriott* and *Century Indemnity* are indeed compatible with *Remmer* and *Montrose II.*

(a) Garriott

In *Garriott, supra,* 221 Cal.App.3d 783, the insured was engaged in the crop dusting business. In 1969, it began using an unlined earthen pit as a disposal site for water used to rinse certain crop dusting equipment. In 1985, the Department of Health Services informed the insured that its property was contaminated. Also in 1985, the City of Bakersfield purchased adjacent property that allegedly had been contaminated by the acts of the insured. The city, seeking damages and injunctive relief, brought an action against the insured for nuisance, trespass to land and negligence. (*Id.* at pp. 786–787.)

In a separate declaratory relief action involving about 20 insurance carriers, the carrier that had provided coverage from 1967 to 1970 through successive liability insurance policies asserted it was not obligated to either defend or indemnify the insured. (*Garriott, supra,* 221 Cal.App.3d at pp. 786–788.) It filed a motion for summary judgment, contending there was no "occurrence" under the provisions of the policies. (*Id.* at p. 788.) The policies defined an "occurrence" as " 'an event or a repeated exposure to conditions, which unexpectedly causes . . . physical injury to or destruction of tangible property . . . during the policy period.' " (*Id.* at p. 791.) The trial court granted the motion for summary judgment on the basis that the city could not have been damaged during the policy periods because it did not purchase its

property until 1985. (*Id.* at p. 789.) The appellate court held that the trial court had erred in granting summary judgment. (*Id.* at pp. 790, 792.)

The appellate court noted that "under the terms of the insurance policies . . . , the event triggering coverage is one that causes 'physical injury to or destruction of tangible property' during the policy period. Nowhere do the policies say to whom that property must belong, save that it must not belong to the insured. In other words, the policies themselves do not expressly require that the eventual claimant own the property at the time the property is damaged for coverage to ensue; they merely require that the damage, the 'physical injury to . . . tangible property,' take place during the policy period. [¶] The question raised by the policy language is not when the [c]ity was damaged; it is, instead, when the property now owned by the [c]ity was damaged." (*Garriott, supra,* 221 Cal.App.3d at p. 791.)

In reaching this conclusion, the appellate court in *Garriott, supra,* 221 Cal.App.3d 783, commented on *Remmer, supra,* 140 Cal.App.2d 84. The *Garriott* court quoted the portion of *Remmer* stating that " '[t]he general rule is that the time of the occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed, but *the time when the complaining party was actually damaged.*' (140 Cal.App.2d at p. 88, italics added.)" (*Garriott, supra,* 221 Cal.App.3d at p. 793.) The *Garriott* court explained that "[a]lthough the statement just quoted from *Remmer* seems to support [the insurer's] position, that support dissolves on closer examination. *Remmer*, unlike this case, did not involve damage to property which changed hands between the date of damage and the date of claim. The *Remmer* court could refer to damage to 'the complaining party' instead of damage to 'the property' because the complaining party owned the property throughout all relevant time periods. Taking the *Remmer* opinion as a whole, the holding turns on when the property damage for which relief was sought occurred." (*Garriott, supra,* 221 Cal.App.3d at p. 793.)

We agree wholeheartedly with this analysis, which compels the conclusion that there is a potential for coverage, and thus a duty to defend, in the case before us. The question is not when the Association suffered damage. The question is when the damage about which the Association complains occurred.

### (b) Century Indemnity

*Century Indemnity, supra,* 98 Cal.App.4th 734, is even more clearly on point than is *Garriott, supra,* 221 Cal.App.3d 783. *Century Indemnity*, like the case before us, involves construction defect litigation.

In *Century Indemnity, supra,* 98 Cal.App.4th 734, one of two insured developers purchased a hotel in 1988. From 1989 through August 1990 the codevelopers made extensive improvements to the hotel, including a nine-story addition. (*Id.* at pp. 736–737.) The hotel changed hands in 1991 and a couple more times thereafter. The plaintiff in the construction defect litigation purchased the hotel in 1994. It filed suit in 1996, asserting that the co-developers had negligently and defectively constructed the improvements. (*Id.* at p. 737.)

The insurers had issued several general liability insurance policies to either one or both of the codevelopers between 1988 and 1993. (*Century Indemnity, supra,* 98 Cal.App.4th at p. 736.) The insuring agreement of each of the policies provided that the insurer would " ' "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." [All policies also provided that the insurance applies only to "bodily injury" or "property damage" that occurs during the policy period.]" ' " (*Ibid.*) The insurers brought a declaratory relief action based on this language. They argued that there was no coverage because the plaintiff purchaser of the hotel could not have suffered any damage during the policy periods. (*Ibid.*) The trial court granted summary judgment in favor of the codevelopers. (*Id.* at p. 737.)

The appellate court affirmed. (*Century Indemnity, supra,* 98 Cal.App.4th at p. 743.) It noted that the insuring agreements provided that the insurance covered property damage occurring during the policy periods. (*Id.* at p. 738.) It observed that " '[t]he clear implication of the complaint is that there existed—at least *potentially*—a covered event, i.e., a continuing and progres-sively deteriorating process which began with defective design and construc-tion . . . *within* the pertinent policy period.' [Citation.]" (*Id.* at p. 740.) The court, citing *Garriott, supra,* 221 Cal.App.3d 783, indicated that the question is not when the current property owner was damaged, but rather when the property was damaged. (*Century Indemnity, supra,* 98 Cal.App.4th at p. 741.) It also stated that *Garriott* was correctly decided and that various cases cited by the insurers were distinguishable (see *A. C. Label Co. v. Transamerica Ins. Co.* (1996) 48 Cal.App.4th 1188 [56 Cal.Rptr.2d 207]; *FMC Corp. v. Plaisted & Companies* (1998) 61 Cal.App.4th 1132 [72 Cal.Rptr.2d 467]; *Montrose II, supra,* 10 Cal.4th 645). (*Century Indemnity, supra,* 98 Cal.App.4th at p. 742.)

In distinguishing *Montrose II, supra,* 10 Cal.4th 645, the court in *Century Indemnity, supra,* 98 Cal.App.4th 734, stated: "In our case, the trigger of coverage, the continuous and progressive injury to the hotel property caused by defective design and construction, occurred during the policy period and activated [the insurer's] defense and indemnity obligations. To require the claim of the third party, [the plaintiff hotel purchaser], to arise during the

policy period, 'would unduly transform [an occurrence-based CGL policy] into a "claims made" policy. . . . The insurance industry's introduction of "claims made" policies into the area of comprehensive liability insurance itself attests to the industry's understanding that the standard occurrence-based CGL policy provides coverage for injury or damage that may not be discovered or manifested until after expiration of the policy period.' [Citation.]" (*Century Indemnity, supra,* 98 Cal.App.4th at p. 743.)

Despite Standard Fire's protestations, we agree with this reasoning. Therefore, based on *Century Indemnity, supra,* 98 Cal.App.4th 734, we hold the trial court in the matter before us erred in granting summary judgment in favor of Standard Fire.

### (2) *Distinguishable Cases*

#### (a) *Introduction*

Standard Fire avers that the proper rule of law is set forth in *A. C. Label Co. v. Transamerica Ins. Co., supra,* 48 Cal.App.4th 1188 (*A. C. Label Co.*), *FMC Corp. v. Plaisted & Companies, supra,* 61 Cal.App.4th 1132 (*FMC Corp.*), and *American Cyanamid Co. v. American Home Assurance Co.* (1994) 30 Cal.App.4th 969 [35 Cal.Rptr.2d 920] (*American Cyanamid Co.*), not in *Century Indemnity, supra,* 98 Cal.App.4th 734, or *Garriott, supra,* 221 Cal.App.3d 783. As we shall show, the additional cases Standard Fire cites are distinguishable from *Century Indemnity, Garriott,* and the case before us.

#### (b) A. C. Label Co.

In *A. C. Label Co., supra,* 48 Cal.App.4th 1188, the insurer issued to the insureds a CGL policy for the period May 1981 to May 1982. In 1984, the insureds acquired a piece of property that had suffered decades of groundwater contamination, some of which allegedly occurred during the policy period. (*Id.* at pp. 1190–1191.) The insureds were sued in 1987 and the insurer refused to defend or indemnify them. (*Id.* at p. 1191.) The insureds then commenced coverage litigation against the insurer. The trial court granted the insurer's demurrer without leave to amend and judgment was entered in favor of the insurer. The appellate court affirmed. (*Ibid.*)

It stated: "Coverage questions arising under a CGL occurrence policy must be resolved based on the facts in existence *at the time that the damage occurred.* [Citation.] The facts in existence at the time that the 1981 and 1982 groundwater contamination occurred on the real property herein in question did not trigger coverage under plaintiffs' CGL policy because, although the *damage* allegedly occurred during the policy period, plaintiffs, the insureds,

were not, and had not been, associated with the property or the groundwater contamination in any way at the time this damage occurred, and therefore plaintiffs were not *liable* for and could not have been held *liable* for this damage at the time that this damage occurred." (*A. C. Label Co., supra,* 48 Cal.App.4th at p. 1192.)

Standard Fire says that its insureds could not have been liable to the Association for any damage to the Project occurring during the policy period, because one of the insureds then owned the Project. Relying on *A. C. Label Co., supra,* 48 Cal.App.4th 1188, Standard Fire contends that the Association's after-acquired interest in the Project cannot be used to create coverage when no liability existed during the policy period.

Standard Fire overlooks a critical distinction between *A. C. Label Co., supra,* 48 Cal.App.4th 1188, and the case before us. In *A. C. Label Co.,* the property was purchased by the insureds after the damage had occurred. In the case before us, the property was owned by one of the insureds at the time the damage allegedly occurred, and plaintiffs were the ones who subsequently acquired interests in the property. This is not a case in which the insureds acquired a piece of property already subject to contamination for which they could have no responsibility. To the contrary, here it is alleged that the insureds were responsible for causing damage to property they were in the process of developing for third party sales.

The court in *A. C. Label Co., supra,* 48 Cal.App.4th 1188, explained that if the insurer were to be liable for damage that occurred before an insured owned the property in question, the insurer would have no opportunity to assess or underwrite the risk associated with that property. (*Id.* at pp. 1194–1195.) In the case before us, however, the insureds were developing the property in question at the time the alleged damage occurred and the insurer had the opportunity to evaluate the risks associated with the development of the property and to underwrite those risks accordingly. In other words, the insurer, before issuing the policy, had the chance to consider the potential construction defect liabilities arising out of the development of the Project. The insurer in *A. C. Label Co.,* in contrast, had no opportunity to assess or underwrite the environmental liabilities associated with a contaminated piece of property the insured did not then own. This distinction is determinative. *A. C. Label Co.* does not support Standard Fire's position.

(c) FMC Corp.

Standard Fire also relies on *FMC Corp., supra,* 61 Cal.App.4th 1132, another toxic waste case. As Standard Fire points out, the case is similar to *A. C. Label Co., supra,* 48 Cal.App.4th 1188. In *FMC Corp.,* as in *A. C.*

*Label Co.,* the insured had no involvement with certain of the contaminated properties until after the expiration of the policy periods under particular occurrence-based general liability policies. (*FMC Corp., supra,* 61 Cal.App.4th at pp. 1150–1151.) The appellate court held there was no coverage with respect to damage to those properties. (*Id.* at pp. 1151–1156.)

In so holding, the court stated: "In no case would, or could, FMC have been declared liable under CERCLA [(42 U.S.C. § 9601 et seq.)] at the time damage occurred within the policy period, because at that time CERCLA did not exist. FMC subsequently became liable, by virtue of CERCLA, for damage which had occurred within policy periods several years before. [¶] But in every instance . . . in which the trial court found coverage under the . . . policies, it was also true that every factual predicate for CERCLA liability, including a nexus between FMC and the damage or the site, could be shown to have existed before or during the policy period. [¶] We consider such a showing of a contemporaneous factual predicate essential to . . . coverage for statutorily expanded risk . . . . For this reason, we shall conclude . . . that coverage for liability under subsequently enacted statutes was not triggered in policy periods in which a sufficient factual nexus could not be shown." (*FMC Corp., supra,* 61 Cal.App.4th at p. 1154, italics omitted.)

The case before us does not have to do with CERCLA liability, and therefore *FMC Corp., supra,* 61 Cal.App.4th 1132, is of limited relevance. Nonetheless, we observe that were we to apply the *FMC Corp.* factual nexus test to the situation before us, we would conclude that Standard Fire had a duty to defend because there is a clear factual nexus between the insureds and the damage in question. That is to say, the allegation is that the insureds were responsible for causing, during the policy period, construction defects with respect to property they were developing at the time.

(d) American Cyanamid Co.

Next, we address *American Cyanamid Co., supra,* 30 Cal.App.4th 969. In the underlying litigation, one competitor brought an unfair competition action against another. The defendant in the unfair competition action brought a declaratory relief action against its insurers, claiming, inter alia, a covered advertising injury. (*Id.* at pp. 972–974, 979.) The policy period in question, as in the case before us, expired before the injured party, i.e., the plaintiff in the unfair competition action, came into existence. (*Id.* at p. 980.) In the coverage litigation, the court addressed several categories of policies with different insuring agreements and definitions. (*Id.* at pp. 978–980.) Standard Fire draws our attention to two policies that required the advertising injury to take place during the policy period. (*Id.* at p. 979.) The trial court found there was no

coverage, reasoning that no advertising injury could take place during the policy period because no competitor then existed. (*Id.* at p. 978.) The appellate court affirmed, on the same ground. (*Id.* at pp. 979–980.)

In reaching its conclusion, the court stated: "The general rule, articulated early on in *Remmer v. Glens Falls Indem. Co.* (1956) 140 Cal.App.2d 84 [295 P.2d 19, 57 A.L.R. 2d 1379], for construing policies covering an accident or occurrence which results in injury during the policy period is that coverage is triggered when the complaining party was actually damaged, not when the wrongful act was committed. [Citations.]" (*American Cyanamid Co., supra,* 30 Cal.App.4th at p. 979.) The court observed that the complaining party in the case before it did not exist during the policy period, so it could not have been damaged during the policy period. (*Id.* at p. 980.)

■ Another way to look at it, however, is simply that no advertising injury could have taken place during the policy period when there was no competitor during that period. It is the existence, during the policy period, of the damage, not the complaining party, that is determinative. In the case before us, what must occur during the policy period is property damage, defined in the policy as physical injury to tangible property. The Association alleges the occurrence of physical injury to tangible property during the policy period and this gives rise to a duty to defend. The fact that the Association did not exist at the time that the injury allegedly took place does not change this.

E. *Economic Losses under First Party Property Insurance Contracts:*

(1) *Introduction*

In addition to arguing about when the damage must occur, or the complaining party must exist, in order to trigger a duty to defend under an occurrence-based commercial general liability policy, Standard Fire argues that the Association's claims are uncovered because they are purely economic losses. In making this argument, Standard Fire throws its hat into the first party property insurance arena. It cites *Devin v. United Services Auto. Assn.* (1992) 6 Cal.App.4th 1149 [8 Cal.Rptr.2d 263] (*Devin*) and *Miller v. Western General Agency, Inc.* (1996) 41 Cal.App.4th 1144 [49 Cal.Rptr.2d 55] (*Miller*), each having to do with claims under homeowners insurance policies.

At the outset, we observe that in basing its arguments on those cases, Standard Fire is mixing apples and oranges—by attempting to apply principles of first party property insurance contract interpretation to third party liability insurance contracts. As the Supreme Court stated in *Montrose II, supra,* 10 Cal.4th at page 663: "To properly analyze the trigger of coverage

issues presented in this case, it is necessary to first clearly distinguish between third party liability insurance, the type of coverage here at issue, and coverage under a first party property insurance policy, such as [a] standardized homeowners policy . . . . [¶] As we [have] observed . . . , a first party insurance policy provides coverage for loss or damage sustained directly by the insured (e.g., life, disability, health, fire, theft and casualty insurance). A third party liability policy, in contrast, provides coverage for liability of the insured to a 'third party' (e.g., a CGL policy, a directors and officers liability policy, or an errors and omissions policy). In the usual first party policy, the insurer promises to pay money to the insured upon the happening of an event, the risk of which has been insured against. In the typical third party liability policy, the carrier assumes a contractual duty to pay judgments the insured becomes legally obligated to pay as damages because of bodily injury or property damage caused by the insured. [Citation.]"

The Supreme Court continued: "The difference in the nature of the risks insured against under first party property policies and third party liability policies is also reflected in the differing causation analyses that must be undertaken to determine coverage under each type of policy. [Citation.] ' "Property insurance . . . is an agreement, a contract, in which the insurer agrees to indemnify the insured in the event that the insured property suffers a covered loss. Coverage, in turn, is commonly provided by reference to causation, e.g., 'loss caused by . . .' certain enumerated perils. [¶] The term 'perils' in traditional property insurance parlance refers to fortuitous, active, physical forces such as lightning, wind, and explosion, which bring about the loss." ' [Citations.] In contrast, ' "the 'cause' of loss in the context of a property insurance contract is totally different from that in a liability policy." ' [Citation.] '[T]he right to coverage in the third party liability insurance context draws on traditional tort concepts of fault, proximate cause and duty. This liability analysis differs substantially from the coverage analysis in the property insurance context, which draws on the relationship between perils that are either covered or excluded in the contract. In liability insurance, by insuring for personal liability, and agreeing to cover the insured for his own negligence, the insurer agrees to cover the insured for a broader spectrum of risks.' [Citation.]" (*Montrose II, supra,* 10 Cal.4th at pp. 663–664, italics omitted.)

Given the foregoing comparison of third party liability policies, such as the occurrence-based commercial general liability policy at issue here, and first party property insurance policies, we could simply dismiss Standard Fire's references to *Devin, supra,* 6 Cal.App.4th 1149, and *Miller, supra,* 41 Cal.App.4th 1144, as being inapplicable. On the other hand, we can as easily show why those cases would not free Standard Fire from its duty to defend even if they did apply.

### (a) Devin

In *Devin, supra,* 6 Cal.App.4th 1149, the purchasers of residential real property sued the sellers for intentional and negligent misrepresentation concerning the condition of the property. They claimed that the sellers failed to disclose property defects due to subsidence problems. The purchasers sought damages for the decreased value of the home and for emotional and physical distress. (*Id.* at p. 1153.) The sellers tendered the defense of the litigation to their homeowners insurance carrier. The insurer declined to provide a defense to the litigation and the sellers filed a bad faith action against the insurer. (*Id.* at pp. 1153–1155.) The trial court granted nonsuit in favor of the insurer and the appellate court affirmed. (*Id.* at pp. 1155, 1162.)

The homeowners policy stated that the insurer would provide a defense if a suit was brought against the insured " 'for damages because of bodily injury or property damage caused by an occurrence to which this coverage applies . . . .' " (*Devin, supra,* 6 Cal.App.4th at pp. 1153–1154, italics omitted.) The term "occurrence" was defined "to mean 'an accident, including exposure to conditions, which results, during the policy period, in: a. bodily injury; or b. property damage.' 'Property damage' was defined as 'physical injury to, destruction of, or loss of use of tangible property.' " (*Id.* at p. 1154, fn. and italics omitted.)

The court held that there was no potentially covered property damage claim. (*Devin, supra,* 6 Cal.App.4th at p. 1158.) It stated: "Where a third party's suit alleges the insured's wrongful conduct caused only economic injury, and there is no suggestion of any wrongful conduct causing injury to tangible property, the insurer does not owe a defense, there being no damage or injury to tangible property within the meaning of the policy. [Citation.]" (*Ibid.*) The court further explained that the claim was for misrepresentation, giving rise only to economic loss. (*Ibid.*)

Contrast the case before us. Here, the Association filed a construction defect lawsuit based on, inter alia, strict liability and negligence. The Association claims tangible property damage caused by the acts of the developers. *Devin, supra,* 6 Cal.App.4th 1149 is inapposite.

### (b) Miller

*Miller, supra,* 41 Cal.App.4th 1144, is a very similar case. There, the purchasers of residential real property sued the sellers for misrepresentation of the condition of the plumbing and for concealment of the defective condition of the plumbing. (*Id.* at p. 1147–1148.) The sellers of the property tendered defense of the litigation to their homeowners insurance carrier, who

declined to provide a defense. (*Id.* at p. 1148.) In the subsequent action for insurance bad faith and breach of contract, the trial court granted summary judgment in favor of the insurer and the appellate court affirmed. (*Id.* at pp. 1147–1148, 1152.)

The insurance policy in *Miller, supra,* 41 Cal.App.4th 1144, defined an "occurrence" "as 'an *accident*,' including exposure to conditions, which results, during the policy period, in *bodily injury* or *property damage*." (*Id.* at p. 1149.) The court held that the alleged misrepresentations did not constitute an "accident" within the meaning of the policy. (*Id.* at p. 1150.) It also held that the purchasers did not claim physical injury to tangible property. (*Id.* at p. 1151.) Rather, their claims for damages for misrepresentation and conceal-ment were claims for economic losses only. (*Ibid.*) Again, the allegation was not that the sellers had damaged the property, but rather that they had lied about the condition of the property. That is the key distinction vis-à-vis the case before us. In the case before us, the Association claims that the developers caused physical damage to the property in question. Standard Fire's reliance on *Miller* is misplaced.

F. *Cause of Action of Subsequent Owner:*

(1) *Introduction*

Insurance contract interpretation aside, Standard Fire contends that the Association does not even have a cause of action against the developers. More particularly, it contends that no one can sue for property damage other than the party that owns the property at the time the damage occurs. In support of this proposition, it cites *Vaughn v. Dame Construction Co.* (1990) 223 Cal.App.3d 144 [272 Cal.Rptr. 261] (*Vaughn*), *Keru Investments, Inc. v. Cube Co.* (1998) 63 Cal.App.4th 1412 [74 Cal.Rptr.2d 744] (*Keru*), and *Krusi v. S.J. Amoroso Construction Co.* (2000) 81 Cal.App.4th 995 [97 Cal.Rptr.2d 294] (*Krusi*). The Association retorts that those cases are not controlling. It insists that applicable case law shows that it does indeed have a cause of action against the developers for the construction defects, and cites *Siegel v. Anderson Homes, Inc.* (2004) 118 Cal.App.4th 994 [13 Cal.Rptr.3d 462] (*Siegel*), *Orange Grove Terrace, supra,* 176 Cal.App.3d 1217, and *Windham, supra,* 109 Cal.App.4th 1162, as governing law. We agree with the Association, for reasons we shall explain.

(2) *Case Law re Effect of Property Transfers*

(a) Vaughn

In *Vaughn, supra,* 223 Cal.App.3d 144, a property owner filed a lawsuit seeking to recover damages for the defective construction of her condo-minium unit. While the action was pending, she sold the unit. (*Id.* at

pp. 146–147.) The defendant construction company filed a motion for summary judgment, arguing that the plaintiff could not maintain the action because she no longer owned the property. (*Ibid.*) The trial court granted the motion, stating that the plaintiff had no standing to bring the action. (*Id.* at p. 146.) The appellate court reversed. (*Id.* at p. 150.)

The appellate court noted that the plaintiff's counsel represented that the new owners of the condominium unit had purchased it with knowledge of its defective condition and presumably had paid at most fair market value for the unit in that condition. (*Vaughn, supra,* 223 Cal.App.3d at p. 149.) It held that, after the sale, the plaintiff remained entitled to pursue the lawsuit. She presumably had suffered loss because she would have been able to obtain a higher price for the unit if it had not been defective. Also, her cause of action was personal, and was not transferred to the new owners of the unit absent an assignment. (*Id.* at pp. 148–149.) As the court put it: "As the person who sustained the damage, the cause of action was vested in plaintiff and she is therefore the real party in interest entitled to maintain the present action. The subsequent sale of the real property did not automatically assign or transfer her cause of action. Accordingly, the court erred in granting summary judgment." (*Id.* at p. 149.)

Based on *Vaughn, supra,* 223 Cal.App.3d 144, Standard Fire argues that the Association can have no cause of action against the developers because no cause of action for property damage was ever assigned to the Association. We disagree, for several reasons. In the case before us, the Association does not stand in the shoes of the subsequent purchasers in *Vaughn*, who bought the individual condominium unit from the prior owner with knowledge of its defects and at a reduced price. Rather, it stands in the shoes of the plaintiff condominium unit owner who commenced the litigation, but for the fact that the Association has not resold the property. Moreover, *Vaughn* is inapposite inasmuch as the case before us does not have to do with an instance in which the first person to purchase from the developer sought to retain standing to sue despite having resold the property. Furthermore, were we to interpret *Vaughn* to bar anyone owning an interest in a condominium complex from maintaining a construction defect action without an assignment from the developer of a cause of action for construction defects, no one owning an interest in a condominium complex would ever have an opportunity to recover construction defect damages.

Finally, as the *Vaughn* court stated: "The primary purpose underlying the requirement that an action be brought in the name of the real party in interest is to protect a defendant from a multiplicity of suits and the further annoyance and vexation at the hands of other claimants *to the same demand.* [Citation.]" (*Vaughn, supra,* 223 Cal.App.3d at p. 149.) Standard Fire has not

told us how this primary purpose would be thwarted if the Association were construed to hold a cause of action against the developers in this matter. It is not as though Bristol House Partnership, Ltd., which owned the Project when it was being developed, and the Association, as the transferee of interests in the Project, were making competing claims to the same damages.

### (b) Keru

In *Keru, supra,* 63 Cal.App.4th 1412, Viljo Kaila sold an apartment building to a group of purchasers (the Moross Group) and took back a deed of trust. (*Id.* at pp. 1414–1415.) While the Moross Group owned the building, they hired a general contractor to perform certain seismic retrofit construction work. (*Id.* at p. 1415.) Years later, the building was severely damaged in the Northridge earthquake. (*Ibid.*) The Moross Group then conveyed the damaged property to Kaila's wholly owned company, Keru Investments, Inc. As part of the deal, Keru Investments, Inc., took the property subject to the Kaila deed of trust, which then secured an outstanding balance of $615,000. Under the purchase agreement, Keru Investments, Inc. acknowledged that the building was severely damaged and agreed to take the property "as is." (*Ibid.*)

After acquiring the property, Kaila and Keru Investments, Inc., filed suit against several defendants, including the general contractor who had performed the seismic retrofit work. (*Keru, supra,* 63 Cal.App.4th at pp. 1414–1415.) The general contractor was held liable for negligence. (*Id.* at p. 1417.) The appellate court reversed. (*Id.* at p. 1425.)

In doing so, it addressed two issues. First, it looked at the potential liability towards Kaila, as the holder of a deed of trust, and held "[t]here [was] no reason . . . to carve out an exception to the rule of nonliability of contractors toward holders of deeds of trust or other interests secured by property for negligent construction which causes impairment of security." (*Keru, supra,* 63 Cal.App.4th at p. 1420.)

Second, the court looked at the potential liability towards Keru Investments, Inc., as the purchaser of the property. The court noted that this was not a case in which a builder or developer had constructed a project for resale, placing it into the stream of commerce where it was foreseeable that the end users would suffer injury from the defective product. (*Keru, supra,* 63 Cal.App.4th at p. 1423.) It then focused its attention on whether Keru Investments, Inc., had suffered any injury giving rise to tort liability. (*Ibid.*) The court held that the Moross Group, which owned the property at the time the damage occurred, suffered the injury and that Keru Investments, Inc., which purchased the property knowing it was damaged, did not have standing to pursue the general contractor in the absence of an assignment from the Moross Group. (*Id.* at pp. 1424–1425.)

*Keru, supra,* 63 Cal.App.4th 1412, is distinguishable from the case before us, on several grounds. For one, we are not concerned here with liability towards a holder of a deed of trust. For another, this is indeed a situation in which the developers constructed a project for resale and placed it into the stream of commerce where it was foreseeable that the end users would suffer injury from the defective product. In addition, this is not an instance in which a purchaser was aware that it was buying damaged property and agreed to take that property "as is," such that it suffered no damages on account of known property defects. Finally, the appeal in *Keru* involved only claims against the general contractor (*id.* at pp. 1415, 1417–1418), not the claims of Keru Investments, Inc., as the subsequent property owner, against the Moross Group for acts they performed as the prior property owners. In contrast, the case before us does not involve only claims against the general contractor. Rather, the Association, as the subsequent owner of certain interests in the Project, is also trying to obtain compensation from the prior owner of the Project, and certain related entities, for acts they performed. Given these distinctions, *Keru* does not compel a conclusion that the Association has no cause of action against any party in the matter before us.

### (c) Krusi

In *Krusi, supra,* 81 Cal.App.4th 995, a commercial building was constructed between 1985 and 1987. (*Id.* at pp. 996–997.) It evidenced a water infiltration problem in the garage and a dispute arose between the original owner of the property, who had contracted with the architect for the design of the building, and the architect. The matter went to arbitration and the arbitrator ruled in favor of the architect. (*Id.* at p. 997.) The property thereafter changed hands several times. The purchasers who acquired the property in 1995 later sued the general contractor who had constructed the building, in addition to certain others. (*Id.* at pp. 997–998.) The trial court granted the general contractor's motion for summary judgment, holding, inter alia, that the purchasers had no standing to sue for the purported construction defects. (*Id.* at pp. 996, 998.) The appellate court affirmed. (*Id.* at p. 1008.)

The appellate court in *Krusi, supra,* 81 Cal.App.4th at page 999, characterized the issue before it "as when a cause of action for design or construction defects accrues and who then owns it . . . ." It concluded: "It is clear that a cause of action for damage to real property accrues when the defendant's act causes ' "immediate and permanent injury" ' to the property or, to put it another way, when there is '[a]ctual and appreciable harm' to the property. [Citation.]" (*Id.* at p. 1005, italics omitted.) The court said that the rule, often applied in asbestos-related injury cases, also applied to "actions alleging negligence in the design, engineering, or construction of buildings." (*Ibid.*)

In completing the analysis, the *Krusi* court said that, generally speaking, a cause of action accrues to the owner of a building who is harmed by faulty design, engineering, or construction work, and that the cause of action is not transferred to a subsequent owner of the property absent an assignment of the cause of action. (*Krusi, supra,* 81 Cal.App.4th at p. 1005.) Standard Fire focuses on this portion of the analysis and says that, according to *Krusi,* the Association, as a subsequent owner, has no cause of action against the developers and therefore there can be no potential liability under the insurance policy.

However, the *Krusi* court also explained that there are instances in which a subsequent owner may indeed have a cause of action even without an assignment from the original owner. It stated: "It is, of course, clear that a tort duty runs from an architect, designer, or contractor to not only the original owner for whom real property improvement services are provided, but also to subsequent owners of the same property. . . . [I]t is a basic rule deriving from the seminal case of *Biakanja v. Irving* [(1958)] 49 Cal.2d 647 [320 P.2d 16]. There, our unanimous Supreme Court . . . held that an action in negligence may be maintained against one not in privity with the plaintiff if, inter alia, the transaction was designed to affect the plaintiff, the injury to the plaintiff was foreseeable and his or her harm certain, and there was a close connection between the defendant's conduct and the harm which occurred. [Citation.] [¶] But, as applied to a case such as this, the *Biakanja* rule simply means that a duty may run from an architect, engineer, or contractor to a subsequent owner of real property. It does not mean that, in a case implicating *damage to such property*, once a cause of action in favor of a prior owner accrues, another cause of action against the same defendant or defendants can accrue to a subsequent property owner—unless, of course, the damage suffered by that subsequent owner is fundamentally different from the earlier type." (*Krusi, supra,* 81 Cal.App.4th at pp. 1005–1006.)

■ We certainly agree with the first portion of the *Krusi* court's statement, that, based on *Biakanja v. Irving, supra,* 49 Cal.2d 647, a tort cause of action may run in favor of a subsequent owner of property under certain circumstances.[7] Query, however, whether some of the limiting language of

---

[7] As the Supreme Court stated in *Aas v. Superior Court* (2000) 24 Cal.4th 627 [101 Cal.Rptr.2d 718, 12 P.3d 1125], a construction defect case, "In *Biakanja,* we held that a defendant's negligent performance of a contractual obligation resulting in damage to the property or economic interests of a person not in privity could support recovery if the defendant was under a duty to protect those interests. The court articulated a case-by-case test for identifying such a duty. 'The determination whether in a specific case the defendant will be held liable to a third person not in privity,' we wrote, 'is a matter of policy and involves the balancing of various factors . . . .' [Citation.] The six factors were: '[1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between

*Krusi* may be imprecise or overbroad. (See *Siegel, supra,* 118 Cal.App.4th at p. 1009 [cause of action accrues in favor of prior owner on *discovery* of damages].) This is not a matter we need resolve, however. According to *Krusi, supra,* 81 Cal.App.4th 995, the original owner of the property may have a cause of action against an architect, engineer or contractor for damage that original owner suffered, and a subsequent owner of the property may have a cause of action against that third party as well, for different damage that subsequent owner suffered. Applied to the facts before us, *Krusi* does not exclude the possibility that the Association, as a subsequent owner, could have a cause of action against a third party architect, engineer, or contractor.

■ More importantly, however, *Krusi, supra,* 81 Cal.App.4th 995, does not exclude the possibility that the Association, as a subsequent owner, may have a cause of action against the prior owner and related entities, which developed the property. In *Krusi,* the issue was whether the prior owner, who had already been to arbitration in a case against the architect, also owned the cause of action against the general contractor, or whether the subsequent owner could hold a cause of action against the general contractor as well. In the case before us, we are concerned not only with any cause of action against the general contractor, but also with whether the Association holds a cause of action directly against the developer, which owned the property at the time the work was performed, and certain of that developer's related entities. Nothing in *Krusi* bars such a cause of action.

### (d) Siegel

Standard Fire relies on *Vaughn, supra,* 223 Cal.App.3d 144, *Keru, supra,* 63 Cal.App.4th 1412, and *Krusi, supra,* 81 Cal.App.4th 995, and argues that they show the Association, as a subsequent owner of an interest in the Project, has no cause of action against the developers. The Association, on the other hand, draws our attention to *Siegel, supra,* 118 Cal.App.4th 994, and argues that it enunciates the better rule on the subject.

In *Siegel,* subsequent owners of homes brought a construction defect action, alleging that the homes suffered from various preexisting defects and

---

the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm.' [Citation.]" (*Id.* at pp. 643–644.) In *Aas,* the plaintiffs had not demonstrated that the third factor was met—that they had suffered any injury or appreciable harm. (*Id.* at p. 646.) However, the court remarked with reference to some of the other factors, that one could "assume for argument's sake that the conduct of a person engaged in construction is 'intended to affect' all foreseeable purchasers of the property. [Citations.] [One could] also assume that a sufficiently 'close[] connection [exists] between . . . defendant's conduct' and the alleged defects. [Citation.]" (*Id.* at pp. 646–647.) In other words, the court left open the door for a duty running to a purchaser in a construction defect lawsuit, in a proper case.

structural damage that they did not discover until after they had purchased the homes. The builder of the homes brought a motion in limine to exclude evidence of the defects on the ground that the subsequent owners had no causes of action against it absent assignments of causes of action by the original homeowners. (*Siegel, supra,* 118 Cal.App.4th at p. 996.) The trial court, relying on *Krusi, supra,* 81 Cal.App.4th 995, granted the motion and thereafter dismissed the complaint. (*Ibid.*)

The appellate court reversed, holding that "absent proof the original owners suffered actual economic injuries as a result of the construction defects . . . , they possessed no causes of action against [the builder] that precluded [the subsequent owners] from maintaining their present claims." (*Siegel, supra,* 118 Cal.App.4th at p. 996.) The court further stated that "the cause of action belongs to the owner who first discovered, or ought to have discovered, the property damage. It is only then that some entity capable of maintaining a legal claim will have suffered a compensable injury, e.g., the cost of repair and/or the loss in the property's value (inasmuch as the owner then has a duty to disclose the damage to potential buyers)." (*Id.* at p. 1009.)

In reaching its conclusion, the *Siegel* court reviewed numerous authorities, including *Vaughn, supra,* 223 Cal.App.3d 144, *Keru, supra,* 63 Cal.App.4th 1412, *Krusi, supra,* 81 Cal.App.4th 995, and several others (e.g., *Sumitomo Bank v. Taurus Developers, Inc.* (1986) 185 Cal.App.3d 211 [229 Cal.Rptr. 719]; *Huang v. Garner* (1984) 157 Cal.App.3d 404 [203 Cal.Rptr. 800]). It aptly concluded that "[a]lthough it is difficult to distill a consistent rule from these decisions regarding when a cause of action for latent construction defects accrues, . . . it would be 'manifestly unjust to deprive plaintiffs of a cause of action before they are aware that they have been injured.' [Citation.]" (*Siegel, supra,* 118 Cal.App.4th at p. 1014.)

We find the reasoning of *Siegel, supra,* 118 Cal.App.4th 994, to be persuasive. Who could have held a cause of action against the developers for construction defects before the Association acquired its interests in the Project? Bristol House Partnership, Ltd. was the declarant under the declaration of covenants, conditions and restrictions (CC&R's) for the Project. Bristol House Partnership, Ltd. executed the CC&R's through Urban Ventures Corporation and Bluestar Realty Ventures, Inc. as its general partners. If we were to adopt Standard Fire's arguments and hold that the Association, as a subsequent owner of interests in the Project, held no cause of action against the developers, then we would have to conclude either that the developers held a cause of action as against themselves, or that no one at all held a cause of action for construction defects. As the court stated in *Siegel*: "A cause of action cannot have accrued before there was someone in a position to actually assert it." (*Id.* at p. 1014.) It would appear that the Association was the first

entity capable of maintaining a legal claim against the developers for the construction defects at issue and must, necessarily, hold a cause of action for the same.

### (3) *Statutory Law re Homeowners Association Litigation*

While Standard Fire has focused its attention on a number of cases outside of the homeowners association arena, the Association has cited the most apposite cases with respect to the cause of action issue. We give our consideration to those cases now.

As we have explained, *Vaughn, supra,* 223 Cal.App.3d 144, *Keru, supra,* 63 Cal.App.4th 1412, and *Krusi, supra,* 81 Cal.App.4th 995, are all distinguishable from the case before us. However, *Orange Grove Terrace, supra,* 176 Cal.App.3d 1217, is on all fours. In *Orange Grove Terrace,* a condominium homeowners association and the owners of five individual condominium units filed suit for damages due to the purportedly negligent repair of the property that took place during the conversion of prior apartments on the site into condominium units. (*Id.* at p. 1219.) The plaintiffs named as defendants the developer (a limited partnership), its general partner (a corporation), and certain officers of, and the sole shareholder of, the general partner. (*Ibid.*) The defendants asserted that the homeowners association lacked standing to sue for damage to the common areas occurring before the homeowners association was organized. (*Id.* at p. 1221.) The appellate court characterized the issue as whether "[the] homeowners association [had] a cause of action for damages to the common areas of [the] condominium project caused by negligent acts or omissions of the developer occurring prior to formal organization of the association." (*Id.* at p. 1219.) The court concluded that the association did have such a cause of action. (*Ibid.*)

The court in *Orange Grove Terrace, supra,* 176 Cal.App.3d 1217, based its decision on former Code of Civil Procedure section 374, which, at the time in question, provided "in part: 'An owners' association established in a project consisting of condominiums . . . shall have standing to sue as the real party in interest for any damages to commonly owned lots, parcels, or areas . . . occasioned by the acts or omissions of others, without joining with it the individual owners of such project . . . .' " (176 Cal.App.3d at p. 1221.) The court stated that "section 374 empower[ed] an association to bring an action against a developer for damages to common areas arising out of defective workmanship or materials. [Citations.]" (*Id.* at p. 1222.)

The *Orange Grove Terrace* court noted that Code of Civil Procedure "[s]ection 374 was repealed by Statutes 1985, chapter 874, section 17. A new section 374 was added by Statutes 1985, chapter 874, section 18, and read[]

as follows: 'An association established to manage a common interest development . . . shall have standing to institute, defend, settle, or intervene in litigation, arbitration, mediation, or administrative proceedings in its own name as the real party in interest and without joining with it the individual owners of the common interest development, in matters pertaining to the following: . . . (b) Damage to the common areas. (c) Damage to the separate interests which the association is obligated to maintain or repair. (d) Damage to the separate interests which arises out of, or is integrally related to, damage to the common areas or separate interests that the association is obligated to maintain or repair.' " (*Orange Grove Terrace, supra,* 176 Cal.App.3d at p. 1221, fn. 1.) That version of Code of Civil Procedure section 374 was later amended and renumbered as Code of Civil Procedure section 383 (Stats. 1993, ch. 151, § 3, p. 1396), which was in turn repealed and replaced by Civil Code section 1368.3, without substantive change (Stats. 2004, ch. 754, §§ 4, § 7). We see nothing in the statutory changes that should undermine either the rationale of *Orange Grove Terrace* or its continued application today. *Orange Grove Terrace* squarely answers the question before us.

■ Standard Fire disagrees, emphasizing that *Orange Grove Terrace, supra,* 176 Cal.App.3d 1217, was predicated on a statutory provision having to do with standing. It is true that Code of Civil Procedure former sections 374 and 383 were couched in terms of standing, as is the current statutory counterpart—Civil Code section 1368.3. However, as clarified in *Windham, supra,* 109 Cal.App.4th 1162, " 'The question of standing to sue is one of the right to relief and goes to the existence of a cause of action against the defendant [citation].' [Citation.]" (*Id.* at p. 1172, fn. omitted.)

The *Windham* court stated with respect to Code of Civil Procedure former section 383 that "because [the] section . . . provides that associations have standing to sue in their own names *as real parties in interest* for damage to common areas, it deems associations to be owners of causes of action for damage to common areas with the right to relief for that damage." (*Windham, supra,* 109 Cal.App.4th at p. 1173; see now Civil Code section 1368.3.) It further stated that "it would be illogical to deprive associations of the ability to sue to recover for damage to common areas they are obligated to repair." (109 Cal.App.4th at p. 1174.) We agree.

*Orange Grove Terrace, supra,* 176 Cal.App.3d 1217, and *Windham, supra,* 109 Cal.App.4th 1162, are determinative of the issue of whether the Association has a cause of action against the developers. The intent of the Legislature is to enable homeowners associations to pursue causes of action against developers with respect to construction defects. To rely on distinguishable cases such as *Vaughn, supra,* 223 Cal.App.3d 144, *Keru, supra,* 63

Cal.App.4th 1412, and *Krusi, supra,* 81 Cal.App.4th 995, to achieve a contrary result would be to frustrate that legislative intent.

### G. *Effect of Cases Seeking Bodily Injury Damages:*

The judgment in favor of Standard Fire is an indicator of the trial court's conclusion that Standard Fire had no duty to defend with respect to the underlying construction defect litigation because there was no potential for coverage for either the Association's property damage claims or the other plaintiffs' bodily injury claims. Standard Fire points out that there are no pending appeals brought by the bodily injury plaintiffs and says that this means the ruling that there is no coverage for bodily injury claims is final. It then argues that the bodily injury and property damage claims cannot be treated differently, citing *Montrose II, supra,* 10 Cal.4th at page 666. Therefore, Standard Fire reasons, since there is no coverage for the bodily injury claims, there can be no coverage for the property damage claims.

The apposite language from *Montrose II, supra,* 10 Cal.4th at page 666, provides: "Accordingly, Montrose and Admiral appear to agree that under a plain reading of that unambiguous aspect of the policy language, whatever be the circumstances (or timing of the circumstances) that will potentially trigger liability coverage under the policies, coverage will apply uniformly under such circumstances whether the claims be for bodily injury, or property damage, alleged in the underlying third party lawsuits." We do not read this language as being the definitive Supreme Court pronouncement that Standard Fire characterizes it to be, inasmuch as it describes the viewpoints of the parties as predicated on the interpretation of the language of a particular policy.

Moreover, in the case before us, the bodily injury claims of the individual condominium unit owners are not at issue on appeal, so we do not address the application of the Standard Fire policy language to those claims.[8] (*Renita S. v. Superior Court* (1994) 29 Cal.App.4th 553, 559 [34 Cal.Rptr.2d 542] [no discussion of matters not at issue].) Most importantly, the fact that those bodily injury claims were curtailed by a procedural mechanism, i.e., the lack of any appeal, does not mean that this court is precluded from engaging in a substantive analysis of the insurance coverage applicable to the property damage claims, which were preserved by way of appeal.

---

[8] As a parenthetical note, even were we to accept Standard Fire's assertion that it was impossible for bodily injury to have occurred during the policy period, we nonetheless would not agree with Standard Fire's proffered corollary that it was therefore impossible for property damage to have occurred during the policy period.

## III

## DISPOSITION

We reverse the judgment and remand the matter for further proceedings consistent with this opinion. The Association shall recover its costs on appeal.

Bedsworth, Acting P. J., and O'Leary, J., concurred.

Respondent's petition for review by the Supreme Court was denied October 18, 2006, S146495. George, C. J., and Baxter, J., did not participate therein.